UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

PRO BONO INVESTMENTS, INC.,

                Plaintiff,

       - against -

CHRISTINA GREEN GERRY, and ABRAHAM
GOLDNER and JOAN FISHER, Executors of
the Estate of Judith H. Green,

              Defendants.

_____

CHRISTINA GREEN GERRY, and ABRAHAM
GOLDNER and JOAN FISHER, Executors of
the Estate of Judith H. Green,

              Counterclaim
              Plaintiffs,

       - against -

PRO BONO INVESTMENTS, INC.; PRO BONO,
LLC; LAWRENCE BISHOP; JOHN DOCKERY;
BISHOP & CO.; FAITH CONGER; RICHARD
CONGER; GRAY SEIFERT & CO., LLC,
f/k/a GRAY, SEIFERT & CO., INC.;
and LEGG MASON,

              Counterclaim
              Defendants.

_____

03 Civ. 4347 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

      The plaintiff, Pro Bono Investments, Inc., ("Pro Bono"),

originally brought an action against defendants, Christina Green

Gerry, daughter of the late Judith H. Green, and Abraham Goldner

and Joan Fisher, Executors of the Estate of Judith H. Green (the

1

"Estate"), for payment on a promissory note allegedly executed by Green on July 12, 2001 (the "Note"), and payable to the plaintiff as a successor-in-interest to a nominee partnership, Bishop & Co. In its Second Amended Complaint, Pro Bono asserted claims for (1) payment on the Note, (2) breach of contract for failure to repay the amounts allegedly loaned, and (3) unjust enrichment.[1]

Gerry, Goldner, and Fisher (the "counter-plaintiffs") have filed counterclaims against Pro Bono Investments, Inc.; Pro Bono Investments, LLC; Lawrence Bishop ("Bishop"); John Dockery; Bishop & Co.; Faith Conger; Richard Conger; Gray, Seifert & Co., LLC, f/k/a Gray, Seifert & Co., Inc. ("Gray Seifert"); and Legg Mason, Inc. ("Legg Mason") (collectively, "the counter-defendants"). The counter-plaintiffs assert fifteen counterclaims. The First Counterclaim is for a declaratory judgment that the Note is void and unenforceable. The Second Counterclaim is based on promissory estoppel against the individual defendant Bishop, based on alleged misrepresentations made by Bishop in connection with Green's down payment on property in Bridgehampton, New York. The Third Counterclaim seeks an accounting from Bishop, Bishop & Co., and Gray Seifert of all holdings and transactions by Green and Gerry during the

---

[1] The plaintiff filed a motion for partial summary judgment and the defendants have cross-moved for summary judgment. These motions for summary judgment are the subject of a separate Opinion and Order issued by this Court.

period from 1980 to 2001.  The Fourth Counterclaim alleges securities fraud against all of the counter-defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 CFR § 240.10b-5, promulgated thereunder.  The counter-plaintiffs also assert a claim for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Gray Seifert and Legg Mason.  The Fifth Counterclaim is for breach of contract against Bishop and Gray Seifert.  The Sixth Counterclaim is asserted pursuant to the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 et seq., against Grey Seifert and Legg Mason as registered investment advisors.  The Seventh Counterclaim asserts common law fraud against all of the counter-defendants.  The Eighth Counterclaim alleges a breach of fiduciary duty by Bishop and Gray Seifert.  The Ninth Counterclaim is based on alleged conversion and is asserted against all the counter-defendants.  The Tenth Counterclaim asserts unjust enrichment against all of the counter-defendants. The Eleventh Counterclaim alleges negligence by Bishop and Gray Seifert.  The Twelfth Counterclaim alleges gross negligence against Bishop and Gray Seifert.  The Thirteenth Counterclaim alleges negligent misrepresentation, which was allegedly committed by Bishop, Bishop & Co., and Gray Seifert.  The Fourteenth Counterclaim seeks indemnification from Bishop,

Bishop & Co., and Gray Seifert.  The Fifteenth Counterclaim

requests that the Court impress a constructive trust on the

funds allegedly retained by Bishop and Gray Seifert.

The counter-defendants move to dismiss the counterclaims

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of

Civil Procedure arguing, among other things, that the securities

fraud claim under § 10(b) is time-barred under the applicable

statutes of limitations, that it fails to state a claim upon

which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6), and that the Second Amended Complaint fails

to allege fraud with particularity as required by Federal Rule

of Civil Procedure 9(b) and the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  In

addition, Gray Seifert and Legg Mason argue that the Section

20(a) claim for control person liability fails to state a claim

and is improperly pleaded.  All of the counter-defendants urge

the Court to decline supplemental jurisdiction over the state

law claims in the event that the counterclaims based on federal

law are dismissed.[2]

---

[2]  The counter-defendants also dispute additional elements of § 10(b) and Rule 10b-5 liability, namely the counter-plaintiffs' scienter and reliance required for Section 10(b) and Rule 10b-5 claims.  In light of the result here, there is no need to reach these additional arguments relating to the § 10(b) and Rule 10b-5 claims or the issue of § 20(a) control person liability against any of the counter-defendants.  See <u>Salinger v. Projectavision</u>, 934 F. Supp. 1402, 1404 n.2 (S.D.N.Y. 1996).

**I.**

On a motion to dismiss a counterclaim, the allegations in the counterclaim are accepted as true. See Universal Acupuncture Pain Servs., P.C. v. State Farm Mutual Auto. Ins. Co., 196 F. Supp. 2d 378, 382 (S.D.N.Y. 2002); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). All reasonable inferences are thus drawn in the counter-plaintiffs' favor. See Universal Acupuncture, 196 F. Supp. 2d at 382; Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the counter-defendants' motion to dismiss should only be granted if it appears that the counter-plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. See Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Grandon, 147 F.3d at 188; Goldman, 754 F.2d at 1065.

In deciding the motion, the Court may consider documents that are referenced in the counterclaims, documents that the counter-plaintiffs relied on in bringing suit and that are

either in the counter-plaintiffs' possession or the counter-plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991); Skeete v. IVF America, Inc., 972 F. Supp. 206, 208 (S.D.N.Y. 1997); VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F. Supp. 2d 435, 437 (S.D.N.Y. 2001); see also N.Y. Mercantile Exch. v. Intercont'l Exch., Inc., 323 F. Supp. 2d 559, 561 (S.D.N.Y. 2004).

## II.

The counter-plaintiffs allege the following relevant facts in the Amended Answer to the Second Amended Complaint.

Christina Green Gerry is a citizen of New York, the daughter of the decedent Judith H. Green, and a residuary beneficiary of the Green Estate.  (Counterclaim ("CC") ¶ 61.) Abraham Goldner and Joan Fisher are co-executors of the Estate, and are both citizens of and reside in New York.  (CC ¶¶ 62-63.) Pro Bono Investments, Inc. is a corporation organized and existing under the laws of Nevada and has its principal place of business in Arizona.  (CC ¶ 64.)  Pro Bono LLC is a Nevada limited liability company to which the assets of Bishop & Co.

purportedly were assigned, transferred, and conveyed on or about
February 12, 2003. (CC ¶ 65.) Lawrence Bishop is an Indiana
citizen who currently resides in New York State. (CC ¶ 66.)
Bishop was a founder and partner of Gray Seifert and the
managing partner of Bishop & Co. (Id.) Bishop & Co. is a
nominee partnership formed on or about November 1, 1986, with
its principal place of business in New York. (CC ¶ 68.) As the
managing partner of Bishop & Co., Bishop was allegedly
responsible for implementing decisions of the partners pursuant
to the instructions from the principals of Bishop & Co., Faith
and Richard Conger. (CC ¶ 66.) John Dockery, a New York
resident, is a lawyer, accountant, and general partner of Bishop
& Co., which he served as a bookkeeper and tax advisor. (CC ¶
67.)

    At all relevant times, Bishop & Co. was a client of its
managing partner, Lawrence Bishop, and of Gray Seifert, and was
controlled by its owners and principals, Richard and Faith
Conger. (CC ¶ 68.) The Congers are citizens of and reside in
New Jersey. (CC ¶ 69.) At all relevant times, the Congers were
clients of Gray Seifert and, according to the counter-
plaintiffs, are allegedly responsible for Bishop's acts and
omissions based on principles of agency, vicarious liability,
respondeat superior, and control person liability under 15
U.S.C. § 78t(a). (Id.)

Gray, Seifert & Co., LLC is the successor-in-interest to Gray, Seifert & Co., Inc. (collectively, "Gray Seifert"), which was a New York corporation with its principal offices in New York at the time of the acts complained of in this action. (CC ¶ 70.) At present, Gray Seifert is a limited liability company organized and existing under Delaware law with its principal offices located in Baltimore, Maryland. Gray Seifert was at all relevant times a registered investment advisor and is alleged to be responsible for Bishop's acts and omissions based on principles of agency, vicarious liability, respondeat superior, and control person liability under 15 U.S.C. § 78t(a). (Id.) Legg Mason is a corporation organized and existing under Maryland law with its principal offices in Baltimore, Maryland. (CC ¶ 71.)

The counter-plaintiffs allege that Lawrence Bishop, a former officer of Gray Seifert, mismanaged assets of the late Judith Green before and after he became an officer of Grey Seifert. When Green's husband, William, died in 1979, he left his widow in excess of $5,000,000, including more than $1,000,000 in cash and cash equivalents, and also a collection of valuable artwork. The residue of his estate, in excess of $1,600,000, was divided equally between two separate trusts created in 1987 for the benefit of each of the couple's children, Christina and Nicholas. (CC ¶ 75.)

In 1980, Green was introduced to Bishop, who offered his services and those of Gray Seifert, to manage the money and assets bequeathed to Green by her late husband. (CC ¶ 76.) On or about October 27, 1980, Green executed an agreement with Gray Seifert (the "Agreement") pursuant to which she opened an investment account (the "Investment Account") under the management of Gray Seifert and Bishop. Under the second paragraph of the Agreement, Gray Seifert was permitted to "arrange custody of the Investment Account in any bank, trust company, brokerage firm or other custodial facility (the "Custodian") as [it] shall select." Under the fourth paragraph of the Agreement, Gray Seifert agreed to ensure that either it or the Custodian "will provide . . . quarterly appraisals of securities in the Investment Account and monthly cash statements." Under the fifth paragraph, Gray Seifert "will have complete and unrestricted ability with respect to the investments of the Investment Account and can trade securities in [its] sole discretion." (CC ¶ 77.) Green made an initial deposit of $1,000,000 to open her Investment Account. (CC ¶ 78.) Pursuant to the Agreement, Gray Seifert thereafter designated Neuberger Berman, Ltd. ("Neuberger Berman") as one of the custodians of Green's investments (the "Neuberger Account"). Over the next twenty years Green deposited in excess of $11 million of her funds into the account. (CC ¶ 79.) The value of

the Neuberger Account had been reduced to zero by the date of
Green's death on September 14, 2001.  (Id.)

Over the course of his stewardship and management of
Green's assets, Bishop allegedly claimed that, in addition to
her investments in publicly-traded securities, Bishop was
investing her money in what he called "special situation"
investments (the "Special Situation Securities"), which were not
held in the Neuberger Account, but rather, were held by other
repositories in other accounts under Bishop's control, including
Bishop & Co.  Bishop & Co. was formed for the benefit of Richard
and Faith Conger, who were defined in the partnership agreement
dated November 1, 1986 (the "Partnership Agreement") as the
"Principals."  Bishop and Dockery were named as the two general
partners of Bishop & Co. and each became liable individually and
jointly and severally, for damages arising from the acts or
misconduct of the other and the partnership.  (CC ¶ 81.)  As the
managing partner of Bishop & Co., Bishop was also required
pursuant to paragraph 6(a) of the Partnership Agreement to
maintain the books and records of the partnership.  (CC ¶ 82.)

The counter-plaintiffs allege that, in connection with the
purchases and sales of Special Situation Securities, Bishop and
Gray Seifert made materially false and misleading statements,
including that these securities were low risk, especially
lucrative, and reserved for preferred clients of Bishop and Gray

10

Seifert.  (CC ¶ 83.)  Bishop and Gray Seifert allegedly failed
to disclose material facts regarding these Securities, including
that they were high-risk private investments not permissible
under Gray Seifert's internal rules and regulations and that in
some cases, Bishop had a personal financial interest in the
investment which precluded him from recommending certain
investments under applicable conflict of interest prohibitions,
including Gray Seifert's internal guidelines and 15 U.S.C. §
80b-6(3).  (CC ¶ 84.)  Moreover, Bishop allegedly made
materially false and misleading statements and omissions in his
capacity as an officer of Gray Seifert and managing partner of
Bishop & Co.  (CC ¶ 85.)  In reliance on Bishop's
misrepresentations and omissions, Green allegedly liquidated her
entire art collection and other investments to provide funding
for the purchase of Special Situation Securities and other
investments.  (CC ¶ 87.)  Except for a brief eighteen-month
period in 1993 and 1994, Green allegedly held an equity interest
in only one publicly-traded company, American Business Computers
Corporation ("ABCC"), and two private companies with unpriced
shares and no ready market, Harris Acquisition Corp. and Wind
Baron Corp.  (CC ¶ 89.)  In connection with the purchases of
these securities, Bishop, Bishop & Co, and Gray Seifert
allegedly failed to disclose that these were penny stock
companies, all with financial difficulties.  Bishop allegedly

failed to disclose that he was a director of ABCC, that he knew
that the company was facing bankruptcy and de-listing from
NASDAQ, and that Green's holdings in ABCC were therefore
worthless.  (CC ¶¶ 99-101.)

On January 25, 1998, Gerry and her mother met with Bishop
at the Gray Seifert offices in New York, New York.  Gerry
secretly tape-recorded the meeting, where Bishop allegedly made
false statements to persuade Green and Gerry that his management
of Green's funds had been profitable and that he had invaded
Green's principal for her benefit, that he had made millions of
dollars investing the proceeds from the sale of her artwork, and
that Green should invest more money with Bishop.  (CC ¶ 91.)  At
the meeting, Bishop allegedly made false and fraudulent
misrepresentations and material omissions in furtherance of a
fraud that allegedly continued up to and including the date of
Green's death, and these statements and omissions "were designed
to bilk Mrs. Green of her assets through investments in Special
Situation Securities."  (CC ¶ 92.)  Bishop allegedly falsely
represented that Bishop & Co was a partnership that he owned
with two other families and that Green's participation in Bishop
& Co.'s investments would be limited to those investments that
were profitable.  Bishop allegedly could make this decision
because he was the general partner in charge of the money.  (CC
¶ 93.)  According to Bishop, Green's investments through Bishop

& Co. had already generated her more than $500,000 in annual
returns.  Bishop also told Green that she had invested $300,000
in real estate ventures that had yielded more than $1.2 million
per year; had received $100,000 from an investment in a latex
glove company and $150,000 through another venture that Green
had invested $15,000 in during 1996 and 1997.  (CC ¶ 94.)

During the January 25, 1998 meeting, Bishop also allegedly
represented that he had two deals, LB/JG Partnership ("LB/JG")
and Second Time Out Partnership ("Second Time Out"), which
involved music products sold in television infomercials.  Bishop
allegedly asked Green for a $100,000 investment in these
ventures, which Green provided through the sale of artwork.  (CC
¶ 95.)  Bishop allegedly failed to disclose that LB/JG was a
high-risk, speculative venture and that, because of his personal
investment in LB/JG and a friendship with LB/JG partner Joseph
Gabriel, Bishop was prohibited from soliciting such investments
under Gray Seifert's internal guidelines and the conflict of
interest prohibitions of 15 U.S.C. § 80b-6(3).  (CC ¶ 97.)

At the January 1998 meeting, Green also expressed concern
about her investment in ABCC, a stock that had not performed
well in the eight years that it had been in her portfolio.  (CC
¶ 99.)  Bishop, a member of the ABCC board of directors,
allegedly directed Green to continue to hold her ABCC stock even
though he knew the company was in danger of collapse.  (CC ¶

100.)  In October 1998, ABCC was de-listed from the NASDAQ.  In
2000 or early 2001, ABCC declared bankruptcy and its shares were
worthless on the date of Green's death.  (CC ¶ 101.)

At the January 1998 meeting, Green asked Bishop for an
accounting of all her past and present investments in private
equities.  Green subsequently made a written request to Bishop.
In that letter, Green indicated that although Bishop had asked
Green to disregard her Neuberger Account statements because they
did not reflect her Special Situation Security holdings, Green
wanted Bishop to provide an accounting of the Special Situation
Securities.  (CC ¶ 103.)  Bishop responded with a memorandum
dated December 14, 1998 in which he stated that Green had a 10%
interest in Bishop's 30% interest in LB/JG Partnership, a 50%
interest in Bishop's 50% interest in Second Time Out
Partnership, and 290,000 shares of ABCC held for her in Bishop &
Co.  (CC ¶ 104.)

On July 12, 2001, Bishop claims that he obtained Green's
signature on a promissory note (the "Note") pledging as
collateral all securities and cash in the Neuberger Account as
well as the shares in her cooperative Park Avenue apartment and
proprietary lease.  Bishop drafted the Note (CC ¶ 107), which
was allegedly requested by Christopher J. ("Kim") Elliman
("Elliman"), a Gray Seifert partner and Legg Mason employee.
Bishop allegedly brought the Note to Green to sign based upon

14

instructions of Legg Mason and Gray Seifert. (CC ¶ 109.) At
the time Green signed the Note, Bishop allegedly failed to
disclose that Green had received money from and was allegedly
indebted to Bishop & Co. for amounts that Bishop had
transferred. Bishop also failed to disclose that the Note might
be used as evidence that Green had an obligation to repay funds
to Bishop & Co. (CC ¶ 110.) Green's signature is not
notarized. Although Green's assistant, Marina Lakner, was
present in Green's apartment where the Note was allegedly
signed, there were no witnesses to the signing other than
Bishop. (CC ¶ 111.) The counter-plaintiffs allege that Bishop,
Gray Seifert, and Legg Mason all misrepresented or failed to
disclose material facts in connection with the procurement of
the purported Note, including the fact that transfers in excess
of $1 million had been made from Bishop & Co.'s Neuberger
account to Green's Neuberger Account, that Bishop & Co. intended
to claim that these transfers were loans, and that Bishop &
Co.'s books and records did not record any loans to Green. The
counter-plaintiffs claim that Green was deceived and did not
know she was subject to any claims of indebtedness when she
allegedly signed the Note. (CC ¶ 114.)

Shortly after the Note was allegedly signed, Bishop's
employment with Gray Seifert ended. (CC ¶ 112.) The counter-
plaintiffs allege that Bishop was either fired or forced to

resign from Gray Seifert because Gray Seifert and Legg Mason knew of Bishop's alleged malfeasance and fraud in connection with the Special Situation Securities in which other Gray Seifert clients, in addition to Green, held interests. (Id.)

On November 19, 2001, one of the Congers allegedly wrote a letter to Elliman at Gray Seifert. The letter states that Bishop's transactions "were made with my full consent and knowledge and are affirmed by me in all respects." (CC ¶ 116.)

In or about April 2002, Bishop went to the offices of co-executor Goldner and informed him that Green owed Bishop & Co. $1,088,000. Bishop did not mention the Note. Rather, Bishop showed Goldner a list of transactions indicating that Bishop & Co. had allegedly loaned money to Green. Goldner made inquiries and reviewed documents, including statements from Green's Neuberger Account, but could not find evidence of indebtedness or investments. (CC ¶ 118.) By letter dated January 14, 2003, Bishop informed Goldner that Bishop and Bishop & Co. were seeking approximately $1.2 million in funds advanced to Green from Bishop & Co., which were purportedly secured by securities in Green's Neuberger Account and shares in her cooperative apartment. Bishop and Bishop & Co. sought to prevent a sale of the apartment, arguing that the shares could not be tendered without the permission of Larry Bishop or Bishop & Co. (CC ¶ 119.)

Bishop & Co.'s legal advisors, Gary Yanker and Logan Fulrath, Jr., subsequently executed assignments purporting to transfer the assets, but not liabilities, of Bishop & Co. The assignments ran first to a Nevada limited liability company named Pro Bono, LLC and from Pro Bono, LLC to Pro Bono Investments, Inc.[3] (CC ¶ 120.) Pro Bono Investments, Inc. is allegedly the successor-in-interest to Bishop & Co. and acts in place of Bishop & Co. in asserting claims against the Estate under the Note. (CC ¶ 121.)

**III.**

In their Fourth Counterclaim, the counter-plaintiffs allege federal securities fraud in violation of Section 10(b) and Rule 10b-5. There are two separate sets of alleged misrepresentations and omissions: (1) statements associated with Green's security investments, including statements allegedly made by Bishop on January 25, 1998 in connection with the LB/JG Partnership, Second Time Out, and ABCC stock, and (2) statements associated with the Note allegedly signed by Green on July 12, 2001. The counter-defendants move pursuant to Rule 12(b)(6) to dismiss the plaintiffs' § 10(b) and Rule 10b-5 claims on the grounds that the first set of alleged misrepresentations and omissions are time-barred, and that the second set of alleged

---

[3] Pro Bono Investments, Inc. and Pro Bono, LLC are referred to throughout this Opinion and Order as "Pro Bono," which refers to whichever entity held assignments from Bishop & Co. at the time.

misrepresentations and omissions were not made "in connection with" the purchase or sale of securities.

**A.**

The Fourth Counterclaim brought pursuant to § 10(b) and Rule 10b-5 is plainly time-barred with respect to alleged securities transactions occurring between 1980 and 1998.[4] Litigation instituted pursuant to § 10(b) and Rule 10b-5 "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991); see also Dodds v. Cigna Secs., Inc., 12 F.3d 346, 349 (2d Cir. 1993). The one-year prong of the statute of limitations on § 10(b) and Rule 10b-5 claims begins to run when the plaintiffs have either actual or constructive notice of the alleged fraud. See Dodds, 12 F.3d at 350; see also Salinger, 934 F. Supp. at 1408. "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often

---

[4] The only transaction alleged to occur after 1998 concerns the execution of the Note, which, for reasons to be described in this Opinion, provides no basis for a federal securities law claim.

analogized to 'storm warnings.'"   <u>Dodds</u>, 12 F.3d at 350

(citations omitted).[5]

   The question of constructive knowledge and inquiry notice

may be one for the trier of fact and therefore ill-suited for

determination on a motion to dismiss.   See <u>Vassilatos v. Ceram</u>

<u>Tech Int'l, Ltd.</u>, No. 92 Civ. 4574, 1993 WL 177780, at *4

(S.D.N.Y. May 19, 1993) (dismissal not appropriate where

discovery might yield facts to support or refute plaintiffs'

constructive knowledge); <u>Siebert v. Nives</u>, 871 F. Supp. 110, 116

(D. Conn. 1994) (noting that not every case is susceptible to

determination of inquiry notice as a matter of law); <u>see also</u>

<u>Salinger</u>, 934 F. Supp. at 1408-09.   Nonetheless, the test is an

objective one and dismissal is appropriate when the facts from

which knowledge may be imputed are clear from the pleadings and

the public disclosures themselves.   See <u>Dodds</u>, 12 F.3d at 352

n.3 ("Where . . . the facts needed for determination of when a

---

[5]   Rather than follow the applicable limitations period established in <u>Lampf</u>,
the counter-plaintiffs urge the Court to rely on the limitations period
established by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Pub. L. No.
107-204, § 804, 116 Stat. 745, 801 (2002) codified in part at 28 U.S.C. §
1658(b).   Under the Sarbanes-Oxley Act, claims brought under § 10(b) and §
20(a) of the Exchange Act may be brought no later than the earlier of: (1)
two years after the discovery of the facts constituting the alleged fraud, or
(2) five years after such fraud.   28 U.S.C. § 1658(b).   However, the counter-
defendants are correct that the period provided by <u>Lampf</u> applies to this case
and that the longer statute of limitations period provided by Sarbanes-Oxley
does not.   For reasons to be explained above, these claims were already time-
barred at the time that the Sarbanes-Oxley Act was enacted on July 30, 2002
and that statute did not revive claims that were already time-barred.   See,
<u>e.g.</u>, <u>In Re Enter. Mortgage Acceptance Co. LLC, Sec. Litig.</u>, 391 F.3d 401,
403-04 (2d Cir. 2004); <u>In re Worldcom, Inc. Sec. Litig.</u>, Nos. 02 Civ. 3288 &
03 Civ. 9499, 2004 WL 1435356, at *7 (S.D.N.Y. June 28, 2004) ("Sarbanes-
Oxley does not revive previously time barred private securities fraud
claims.").

reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig., 850 F. Supp. 1105, 1132-33 (S.D.N.Y. 1993) ("Integrated I"); Lenz v. Assoc'd Inns & Rests. Co. of Am., 833 F. Supp. 362, 370 & n.7 (S.D.N.Y. 1993); see also Menowitz v. Brown, 991 F.2d 36, 42 (2d Cir. 1993) (affirming dismissal based on finding that plaintiffs were placed on inquiry notice based on SEC filings). The plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them. See Dodds, 12 F.3d at 352 ("An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice."); In re Integrated Resources Real Estate Sec. Litig., 815 F. Supp. 620, 637 (S.D.N.Y. 1993) ("Integrated II") ("[T]he statute is not tolled for a plaintiff's leisurely discovery of the full details of the alleged scheme. Instead, the period runs from the time at which a plaintiff should have discovered the general fraudulent scheme." (citations and internal quotations omitted)). The available facts must establish the probability of fraud, however, and not merely the possibility of fraud. See

Lenz, 833 F. Supp. at 373 & n. 10; Integrated II, 815 F. Supp.

at 638; see also Salinger, 934 F. Supp. at 1408-09.

This action was originally commenced by Pro Bono against

the Estate as part of an effort to recover money allegedly

loaned to Green pursuant to the Note.  Pro Bono amended its

complaint to add Gerry as an additional defendant.  On March 30,

2004, the Estate and Gerry filed counterclaims against Pro Bono

and added Gray Seifert and Legg Mason, among others, as

additional counter-defendants.[6]  The Fourth Counterclaim based on

securities transactions that allegedly occurred between 1980 and

1998 is therefore time-barred because the counterclaims were

filed on March 30, 2004, more than six years after the counter-

plaintiffs knew or should have known the facts surrounding the

transactions alleged to be fraudulent.[7]  The most recent

securities transactions alleged in this action all occurred in

early 1998 or before; thus, if measured by three years after the

date of the last alleged violation, these counterclaims were

---

[6] The counter-plaintiffs originally asserted counterclaims against Pro Bono
and Bishop on September 19, 2003, seeking a judgment that they did not owe
Pro Bono on the alleged Note.  They filed an Amended Answer on March 30, 2004
that asserted counterclaims relating to the investment relationship between
Green and Gerry and Bishop, Bishop & Co., and Gray Seifert (including the
counterclaims against the additional counter-defendants) for the first time.
In July 2004, the counter-defendants all moved to dismiss the counterclaims.
After a court conference on October 6, 2004, the counter-defendants filed an
Amended Answer to the Second Amended Complaint with Counterclaims.  Those
counterclaims not directly related to the alleged Note do not relate back to
the September 19, 2003 date.

[7] Even under the longer statute of limitations provided by Sarbanes-Oxley, the
counter-plaintiffs were on inquiry notice of the facts constituting the
alleged fraud at the time that the alleged fraudulent statements were made,
which was more than two years before the complaint was filed.

time-barred by early 2001 at the latest. Gerry was also on notice of possible fraud with respect to her mother's securities portfolio at least as of January 25, 1998, when Gerry, suspecting Bishop of committing fraud in connection with her mother's accounts, secretly tape-recorded a meeting with Bishop. The counter-plaintiffs therefore discovered or at least should have discovered the facts constituting the alleged violation prior to January 25, 1998. One year after the discovery of the facts constituting the alleged violation would have been January 25, 1999, more than five years before the counterclaims alleging federal securities fraud were filed.

The counter-plaintiffs argue that these securities counterclaims are timely under principles of equitable tolling and the continuing wrong doctrine. Under the counter-plaintiffs' theory of the case, the securities transactions beginning in 1980 are related to and part of the fraud that continued up to and including Bishop's alleged procurement of the Note. Both arguments are without merit. The three-year statute of limitations period established for securities claims is measured from the date of the alleged securities transaction, and the Supreme Court instructs that equitable tolling is unavailable in § 10(b) actions because "the three-year limit is a period of repose inconsistent with tolling." Lampf, 501 U.S. at 363; see also CSI Inv. Partners II, L.P. v. Cedant Corp., 180

F. Supp. 2d 444, 462 (S.D.N.Y. 2001); <u>Friedman v. Wheat First</u>
<u>Sec.</u>, 64 F. Supp. 2d 338, 344-45 (S.D.N.Y. 1999).

The continuing wrong doctrine is also inapplicable. Each
of the cases relied on by the counter-plaintiffs involve SEC
enforcement actions that are governed by a different statute of
limitations than private securities actions brought by
investors, and one of the cases relied on by the counter-
plaintiffs explicitly acknowledges that the continuing wrong
doctrine may not apply to securities fraud actions. <u>See</u> <u>SEC v.</u>
<u>Caserta</u>, 75 F. Supp. 2d 79, 89 (E.D.N.Y. 1999) (noting "it is
not at all certain that the continuing violation doctrine
applies in securities fraud litigation."); <u>accord</u> <u>De La Fuente</u>
<u>v. DCI Telecom, Inc.</u>, 206 F.R.D. 369, 385-86 (S.D.N.Y. 2002).
In any event, even if the continuing wrong doctrine were applied
to this case, no securities transactions occurred within the
three-year limitations period. The counter-plaintiffs do not
allege that the securities transactions allegedly occurring
between 1980 and 1998 have any connection to the securities
pledged under the Note. For the reasons explained below, the
Note executed by Green was not a securities transaction and
there is no allegation that the Note was in any way related to
the transactions that occurred between 1980 and 1998. The
execution of the Note was therefore not "so closely related" to
the time-barred claims of stock allegedly purchased between 1980

and 1998 "as to be viewed as part of a continuing practice for which recovery should be had for all violations." See Caserta, 75 F. Supp. 2d at 89.

With respect to the amended counterclaims asserted against Grey Seifert and Legg Mason filed on March 30, 2004, those counter-defendants have an additional argument why the § 10(b) and Rule 10b-5 counterclaims are time-barred. The counter-plaintiffs attempt to "relate back" their claims to original counterclaims filed on September 19, 2003, in which neither Gray Seifert nor Legg Mason were named as parties. The relation back argument is without merit. Federal Rule of Civil Procedure 15(c) provides that a claim in an amended pleading relates back to the date of the original pleading if it arose out of the "conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." When new parties are added to an amended pleading, the pleading relates back to the original pleading date only if the new party "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed. R. Civ. P. 15(c)(3); see also Enter. Mortgage Acceptance Co., LLC, Sec. Litig., 391 F.3d 401, 405 n.2 (2d Cir. 2004) (citing Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994)). "If the reason for not naming the party is anything other than a mistake of identity, then the relation back

doctrine is unavailable." <u>Nordco, A.S. v. Ledes</u>, No. 95 Civ.
7753, 1999 WL 1243883, at *3 (S.D.N.Y. Dec. 21, 1999) (citations
omitted).  In this case, Gray Seifert and Legg Mason were not
named in the original counterclaims and the counter-plaintiffs
have not alleged that there was any mistake in identity in not
naming these parties.  The counter-plaintiffs' attempt to revive
their time-barred claims against Gray Seifert and Legg Mason
through the relation back doctrine fails.

Finally, the counter-plaintiffs cannot rely on the absence
of documents to overcome the time bar.  The counter-plaintiffs
should be able to plead its amended counterclaims without the
benefit of discovery and must at least identify the transactions
at issue.  In this case, Gray Seifert points out that
significant disclosures were already made, including over six
thousand pages of documents making up the whole of Green's
account records (with the exception of the year 1990) and all of
the recorded correspondence between Green and Gray Seifert from
1980 to 2001.  (<u>See</u> Decl. of Lauren C. Gould dated Mar. 4, 2005
¶ 10.)  Accordingly, the counter-defendants' motion to dismiss
the fourth counterclaim brought pursuant to § 10(b) and Rule
10b-5 as time-barred is granted with respect to the allegations
of securities fraud associated with Green's alleged securities
transactions occurring between 1980 and 1998.

**B.**

The counter-defendants acknowledge that the securities fraud claim based upon the promissory Note allegedly signed by Green on July 12, 2001 is not time-barred by the statute of limitations because the counterclaims were brought within three-years of the procurement of the Note.  However, it is clear that the fraud alleged in connection with the procurement of the Note was not "in connection with" the "purchase" or "sale" of "securities" as required by § 10(b) and Rule 10b-5.

The Note consisted of a pledge of stocks in Green's Neuberger Account and the shares in her cooperative apartment. The parties dispute whether the pledge of securities in the Neuberger Account constitutes the purchase or sale of a security for purposes of the antifraud provisions of the federal securities laws.  According to the counter-plaintiffs, if the Note was actually signed by Green, then it must have been fraudulently obtained because Bishop did not disclose either the fact that Bishop & Co. had allegedly loaned $1,000,000 to Green, or the fact that Bishop & Co. would use the Note to secure the return of the money.[8]  See, e.g., Mallis v. Fed. Deposit Ins.

---

[8] There is an obvious tension between the counter-plaintiffs' theory, on the one hand, that Green never signed the Note, and on the other, that Green was fraudulently induced, based on Bishop's alleged misrepresentations and omissions, to sign such a pledge.  Assuming that the Note was actually executed, the counter-plaintiffs argue that Green's pledge of shares in her cooperative apartment and stock in her Neuberger Account constitutes both a

Corp., 568 F.2d 824, 830 (2d Cir. 1977); United States v.

Gentile, 520 F.2d 461, 466-67 (2d Cir. 1975).  The counter-

defendants respond that although the pledge of a security can,

under some circumstances, constitute a "purchase or sale" of

securities for purposes of § 10b, "[m]isrepresentations involved

in a securities transaction but not pertaining to the securities

themselves cannot form the basis of a violation of § 10(b) or

Rule 10b-5."  Citibank v. K-H Corp., No. 89 Civ. 3609, 1991 WL

35951, at *3-*4 (S.D.N.Y. Mar. 14, 1991) (citations omitted),

aff'd 968 F.2d 1489, 1495 (2d Cir. 1992).  In this case, the

alleged misrepresentations about the Note were not in any way

connected with the collateral.  Rather, Bishop's alleged

misrepresentations and omissions concerned the issue of whether

Green owed money to Bishop & Co. as a result of alleged loans.

There is no allegation that Bishop's alleged misrepresentations

and omissions -- assuming that representations were even made

and that the Note was signed at all -- had any bearing on the

nature or value of the securities underlying the Note.  The

counter-plaintiffs' have therefore failed to state a valid claim

that the alleged misrepresentations concerning the Note were in

connection with the purchase or sale of securities.

---

purchase and a sale of securities within the scope of § 10(b) and would
therefore be sufficient to trigger liability under § 10(b) and Rule 10b-5.

Accordingly, the counter-defendants' motion to dismiss the §
10(b) and Rule 10b-5 claims must be granted.

Even assuming that the counter-plaintiffs' allegations
satisfied the "in connection with" requirement, the counter-
plaintiffs have plainly failed to allege loss causation with
respect to the Note.  A securities fraud plaintiff must plead
and prove a causal connection between the content of the alleged
misstatements or omissions and the harm actually suffered.  See
Dura Pharm., Inc. v. Broudo, 125 S. Ct. 1627, 1633 (2005);
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, 343 F.3d
189, 198-99 (2d Cir. 2003).  To plead causation sufficiently
under Section 10(b) "a plaintiff must allege both transaction
causation, i.e.[,] that but for the fraudulent statement or
omission, the plaintiff would not have entered into the
transaction; and loss causation, i.e., that the subject of the
fraudulent statement or omission was the cause of the actual
loss suffered."  In re Parmalat Sec. Litig., 378 F. Supp. 2d
278, 302 (S.D.N.Y. 2005) (footnote omitted).  Loss causation is
established by pleading that (1) the misrepresentation
artificially inflated the value of the security, or otherwise
misrepresented its investment quality, and (2) the subject of
the misrepresentation caused the decline in the value of the
security.  Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274,
289 (S.D.N.Y. 2004) (interpreting requirements for pleading loss

28

causation in <u>Suez Equity</u> and <u>Emergent Capital</u>).  The Supreme

Court instructs that a plaintiff must allege that a "defendant's

misrepresentation (or other fraudulent conduct) proximately

caused the plaintiff's economic loss."  <u>See</u> <u>Parmalat</u>, 378 F.

Supp. 2d at 305 (quoting <u>Dura Pharm., Inc.</u>, 125 S. Ct. at 1633).

"To plead loss causation, the complaint must allege facts that

support an inference that [the defendant's] misstatements and

omissions concealed the circumstances that bear upon the loss

suffered such that plaintiffs would have been spared all or an

ascertainable portion of that loss absent the fraud."  <u>Id.</u>

(quoting <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 175

(2d Cir. 2005)).  In short, "the damages suffered by plaintiff

must be a foreseeable consequence of any misrepresentation or

material omission."  <u>Id.</u> (quoting <u>Emergent Capital</u>, 343 F.3d at

197.); <u>see also</u> <u>Citibank</u>, 1991 WL 35951, at *4.

    In this case, the losses allegedly sustained by the

counter-plaintiffs in connection with the Note have nothing to

do with any misrepresentations regarding the value of the

securities that collateralized the Note.  Rather, the counter-

plaintiffs merely allege that they have incurred attorneys' fees

and costs in defending against the enforcement of the Note and

in removing a lien on the sale of Green's apartment.  (<u>See</u>

Counterclaimants' Omnibus Mem. in Opp'n to Mots. to Dismiss

Counterclaims at 26.)  These losses have nothing to do with the

value of the securities allegedly pledged by Green.[9]  Because the

counter-plaintiffs have not suffered a loss related to any

alleged misrepresentations about the value of the securities

underlying the Note, the counter-defendants' motion to dismiss

the counter-plaintiffs' Fourth Counterclaim alleging securities

fraud in violation of § 10(b) and Rule 10b-5 claims must be

granted.

**IV.**

The counter-plaintiffs, in their Sixth Counterclaim, argue

that under the Advisers Act, Gray Seifert and Legg Mason, as

registered investment advisers, had fiduciary duties to Green

and Gerry.  The counter-defendants correctly argue that this

federal claim, seeking restitution, jointly and severally, from

Gray Seifert and Legg Mason for alleged violations of the

Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq., is

also time-barred.

The Supreme Court has recognized that the only private

remedy under the Advisors Act is an action for rescission and

restitution.  See Transamerica Mortgage Advisers, Inc., (TAMA)

v. Lewis, 444 U.S. 11, 24 & n.14 (1979).  No specific statute of

limitations is provided for such an action in the Advisers Act

_____

[9] Because the counter-plaintiffs' fourth cause of action is dismissed because
it is time-barred and for failure to plead loss causation, it is not
necessary to reach the counter-defendants' additional arguments that the
counter-plaintiffs have failed to plead securities fraud with particularity
as required under Federal Rule of Civil Procedure 9(b) and the PSLRA.

itself.  <u>Kahn v. Kohlberg, Kravis, Roberts & Co.</u>, 970 F.2d 1030,

1033 (2d Cir. 1992).  Before Sarbanes-Oxley, courts applied in

Advisors Act cases the same one-year/three-year statute of

limitations period that applies to other federal securities

claims.  <u>Id.</u>  Therefore, under the statute, the claims in this

case -- which do not allege any securities-related misstatements

or omissions occurring after 1998 -- were time-barred no later

than January 2001, three years after the last alleged

transaction.  The counter-defendants' motion to dismiss the

Sixth Counterclaim is granted.[10]

### V.

The counter-defendants urge the Court to decline to

exercise supplemental jurisdiction over the remaining

counterclaims, all of which arise under state law.

In this case, there is no diversity of citizenship

jurisdiction over the state law counterclaims because counter-

defendant John Dockery ("Dockery") is a citizen of New York, as

are the counter-plaintiffs.  <u>See</u> 28 U.S.C. § 1332; <u>Owen Equip. &

Erection Co. v. Kroger</u>, 437 U.S. 365, 373-74 (1978).

---

[10] There is no basis for the argument that Sarbanes-Oxley's two-year inquiry
notice/five-year statute of limitations should apply because the Investment
Advisers Act claim was already time-barred when the Sarbanes-Oxley Act was
enacted and that statute did not revive time-barred claims.  <u>See</u> <u>In re Enter.
Mortgage Acceptance Co. Sec. Litig.</u>, 391 F.3d at 403-04.

Thus, the only basis for subject matter jurisdiction over the state law counterclaims is supplemental jurisdiction under 28 U.S.C. § 1367.  Section 1367(a) provides that

> "...in any civil action of which the district courts have
> original jurisdiction, the district courts shall have
> supplemental jurisdiction over all other claims that are so
> related to claims in the action within such original
> jurisdiction that they form part of the same case or
> controversy under Article III of the United States
> Constitution.  Such supplemental jurisdiction shall include
> claims that involve the joinder or intervention of additional
> parties."

28 U.S.C. § 1367(a).

The Supreme Court and the Court of Appeals for the Second Circuit have held that claims form part of the same case or controversy as the claims over which the court has original jurisdiction within the meaning of Article III, and thus within the meaning of Section 1367(a), if they "derive from a common nucleus of operative facts."  City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)); Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004). Supplemental jurisdiction therefore exists where the original and supplemental claims arise from the same basic facts, but does not where they rest "on essentially unrelated facts." Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704 (2d Cir. 2000).

In this case Section 1367(a) confers supplemental jurisdiction over those counterclaims that fall within the same

case or controversy as either (1) the plaintiff's original claims or (2) the counterclaims asserted under federal law, because all of these claims are "within [the Court's] original jurisdiction."  28 U.S.C. § 1367(a).

The counter-plaintiffs' First Counterclaim (for a declaratory judgment that the promissory note is not enforceable) and Fourteenth Counterclaim (for indemnification for any liability defendants/counter-plaintiffs might have to Pro Bono) form part of the same case or controversy as the plaintiff's original claims.  Among the plaintiff's original claims were a claim to enforce the alleged Note and a claim for breach of contract, with the alleged Note being the contract in question, and a claim for indemnification of any liability to plaintiff on the original claims falls within the same case or controversy.  These counterclaims thus share "a common nucleus of facts" with the original claims.  See Kristensons-Petroleum, Inc. v. Sealock Tanker Co., Ltd., 304 F. Supp. 2d 584, 588 (S.D.N.Y. 2004).  Indeed, these counterclaims "arise[] out of the same transaction or occurrence that is the subject matter of the opposing party's claim" such that they are compulsory counterclaims within the meaning of Federal Rule of Civil Procedure 13(a).  Compulsory counterclaims fall within the same "case or controversy" as the original claims and supplemental

jurisdiction over them exists.  Jones v. Ford Motor Credit Co.,
358 F.3d 205, 212-213 (2d Cir. 2004).

The Court also has supplemental jurisdiction over the
remaining state law counterclaims, with the exception of the
Second Counterclaim, because they relate to Bishop and Gray
Seifert's handling of Green and Gerry's investments and thus
share a "common nucleus of facts" with the federal securities
law claims.[11]  These counterclaims are sufficiently related to
counter-plaintiffs' federal securities claims to confer
supplemental jurisdiction and the Court's dismissal of the
related federal claims does not deprive it of the power to
exercise that jurisdiction.  See Nowak v. Ironworkers Local 6
Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996).

---

[11] The Third Counterclaim seeks an accounting of all holdings, transactions,
and dispositions of assets of Green from 1980 to 2001, and of the Christina
Green Trust and Gerry from 1987 through 2001.  The Fifth Counterclaim alleges
that Bishop and Gray Seifert breached a valid investment advisory contract
with Green and Gerry.  The Seventh Counterclaim alleges that all counter-
defendants are liable to Goldner and Fisher for fraud because of Bishop's
alleged misrepresentations to Green in connection with her investments made
through Bishop & Co.  The Eighth Counterclaim alleges that Bishop and Gray
Seifert are liable to counter-plaintiffs for breach of the fiduciary duty
allegedly owed to Green and Gerry as their investment advisors.  The Ninth
Counterclaim alleges that all counter-defendants are liable to counter-
plaintiffs for Bishop, Bishop & Co., and Gray Seifert's alleged conversion of
Green and Gerry's funds to their own use.  The Tenth Counterclaim alleges
that Bishop and Gray Seifert were unjustly enriched because they retained
fees paid by Green, Gerry, and the Christina Green Trust to cover Bishop's
personal investment losses and those of his principals.  The Eleventh,
Twelfth, and Thirteenth Counterclaims allege, respectively, that Bishop and
Gray Seifert were negligent and grossly negligent in the conduct of, and
negligently misrepresented the performance of, their investment activities on
behalf of Green, Gerry, and the Christina Green Trust.  Bishop & Co. is also
a defendant in the Thirteenth Counterclaim.  The Fifteenth Counterclaim
requests that, in the event an adequate remedy at law does not exist, the
Court impose a constructive trust in favor of counter-plaintiffs on the funds
allegedly wrongfully detained by Bishop and Gray Seifert.

On the other hand, the counter-plaintiffs' Second
Counterclaim, to recover damages from Bishop on a theory of
promissory estoppel because he allegedly represented to Green
that he would guarantee the purchase price on property in
Bridgehampton, New York, falls wholly outside the "common
nucleus of operative fact" required to confer supplemental
jurisdiction under Section 1367(a).  There is no relation
between Pro Bono's claims for repayment of the funds allegedly
advanced to Green by Bishop & Co., or between the alleged
violations of federal securities laws, and alleged promises by
Bishop to guarantee the purchase price of this property, and
therefore the Court lacks supplemental jurisdiction over this
counterclaim.

The counter-plaintiffs assert that their Twelfth
Affirmative Defense to Pro Bono's claims, seeking "a setoff" of
their potential liability to plaintiff for, among other things,
money due them because of Bishop's alleged failure to keep his
promise to finance the purchase of the Bridgehampton property,
brings this counterclaim within the reach of 28 U.S.C. §
1367(a).  (See Counterclaimants' Omnibus Memorandum in
Opposition to Motions to Dismiss Counterclaims, at 37.)  This
assertion is without merit.  If merely requesting a setoff of
potential liability on the original claims is sufficient to
bring a claim within Section 1367(a), a counter-plaintiff could

plead such an affirmative defense in every case and thereby
render meaningless Section 1367(a)'s limitation of supplemental
jurisdiction to "claims that are so related to claims in the
action within such original jurisdiction that they form part of
the same case or controversy under Article III of the United
States Constitution."  It is well established that courts
should, if possible, give effect to every clause and word in a
statute.  Duncan v. Walker, 533 U.S. 167, 174 (2001); Cal. Pub.
Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 106 (2d
Cir. 2004).  The counter-plaintiffs have cited no case where a
claim was held to fall within Section 1367(a)'s jurisdictional
grant solely because a setoff of the counter-plaintiffs'
potential liability on the original claims was sought.[12]  The
counter-plaintiffs' Second Counterclaim is therefore dismissed
for lack of subject matter jurisdiction.

**B.**

---

[12] There was a connection between supplemental jurisdiction and the concept of
setoff predating Section 1367's enactment in 1990.  Prior caselaw drew a
distinction between compulsory counterclaims, over which federal courts could
exercise ancillary (now supplemental) jurisdiction, and permissive
counterclaims, over which an independent basis of federal jurisdiction was
required.  See, e.g., O'Connell v. Erie Lackawanna R.R., 391 F.2d 156, 163
(2d Cir. 1968).  At times courts would, however, exercise ancillary
jurisdiction over permissive counterclaims where a purely defensive setoff of
liability was sought.  See Ambromovage v. United Mine Workers of Am., 726
F.2d 972, 988 n.47 (3d Cir. 1984); see also Marks v. Spitz, 4 F.R.D. 348, 350
(D. Mass. 1945).  The Court of Appeals has made clear, however, that Section
1367 displaced the prior, judge-made, jurisdictional standards.  Jones v.
Ford Motor Credit Co., 358 F.3d 205, 212-213 (2d Cir. 2004).  Under Section
1367, supplemental jurisdiction exists over permissive counterclaims only so
long as they satisfy Section 1367(a)'s "case or controversy" test,
irrespective of whether or not a setoff is requested.  See id.

While the Court has supplemental jurisdiction over all counterclaims except the Second, Section 1367(c) affords a district court discretion, where certain conditions have been satisfied, to decline to exercise such jurisdiction if doing so promotes "'economy, convenience, fairness, and comity.'" Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 446-48 (2d Cir. 1998) (quotation omitted); 28 U.S.C. § 1367(c).

Section 1367(c) provides four specific bases for declining supplemental jurisdiction over a claim.[13] The Court of Appeals has held that, as a precondition to declining supplemental jurisdiction, a district court must identify a factual predicate corresponding to one of Section 1367(c)'s four enumerated categories. Where the bases for declining supplemental jurisdiction do not exist, the Court must exercise that jurisdiction. Itar-Tass, 140 F.3d at 446-47. The only arguable bases to decline jurisdiction here are Sections 1367(c)(3) and (c)(2). As explained below, neither Section 1367(c)(3) nor Section 1367(c)(2), the two possibly applicable bases, provides a basis to decline supplemental jurisdiction.

---

[13] 28 U.S.C. § 1367(c) provides:
> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
>> (1) the claim raises a novel or complex issue of State law,
>> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Section 1367(c)(3) authorizes district courts to decline supplemental jurisdiction where the court "has dismissed all claims over which it has original jurisdiction."  In this case, however, although the Court has dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Fourth and Sixth Counterclaims, over which the Court had original jurisdiction because they arise under federal law, the Court has not dismissed all of the plaintiff's original claims.  By separate Opinion and Order, the Court granted the defendants' cross-motion for summary judgment on plaintiffs' breach of contract claim and claim for payment on an alleged promissory note, but denied the defendants' cross-motion for summary judgment on plaintiff's unjust enrichment claim.  This claim, over which the Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), remains in the case.  The Court cannot, therefore, properly decline supplemental jurisdiction under Section 1367(c)(3).  See Jones, 358 F.3d at 214.

A district court may also decline supplemental jurisdiction over a claim that "substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c)(2).  The inquiry under Section 1367(c)(2) turns on whether the supplemental claims "are more complex or require more judicial resources or are more salient in the case as a whole" than the claims over which the court has original

jurisdiction.  Luongo v. National Mut. Ins. Co., No. 95 Civ.
3190, 1996 WL 445365 at *5 (S.D.N.Y. Aug. 7, 1996).  The sole
remaining claim in this case over which the Court has original
jurisdiction is the plaintiff's unjust enrichment claim.  Two of
the twelve remaining counterclaims, the First and the Fourteenth
Counterclaims, address substantially the same issues that will
be litigated in connection with that claim, and cannot be
dismissed on this basis.

With respect to the other ten state law counterclaims, the
relationship between these counterclaims and Pro Bono's unjust
enrichment claim is sufficiently close that the Court cannot
decline supplemental jurisdiction over them; the counter-
plaintiffs' defense to the unjust enrichment claim will require
litigation concerning the investment relationship Green had with
Bishop, Bishop & Co., and Gray Seifert.  Accordingly, the Court
will exercise supplemental jurisdiction over those counterclaims
as well.

## VI.

Even though supplemental jurisdiction exists over twelve of
the thirteen state law counterclaims, the counter-defendants
have moved to dismiss these counterclaims on the merits.

The First Counterclaim seeks a declaratory judgment that
the alleged Note is invalid.  Because the Court has, by separate
Opinion and Order, granted summary judgment in favor of the

defendants-counter-plaintiffs on both of Pro Bono's original claims based upon the alleged Note, this counterclaim is dismissed as moot.

The Third Counterclaim seeks an accounting of all holdings, transactions, and dispositions of assets of Green from 1980 to 2001, and of the Christina Green Trust and Gerry from 1987 through 2001. Bishop & Co. argues that this claim is time-barred under a three-year statute of limitations because it is only incidental to claims for money damages for breach of fiduciary duty. Counter-plaintiffs argue that the six-year statute of limitations for fraud applies. N.Y. C.P.L.R. § 213(8). Even for a breach of fiduciary duty claim, the statute of limitations for an equitable remedy such as an accounting is six years. N.Y. C.P.L.R. § 213(1). Where, as here, the breach of fiduciary duty involves allegations of actual fraud, the statute of limitations is six years regardless of the remedy sought. Kaufman v. Cohen, 760 N.Y.S.2d 157, 164 (1st Dep't 2003). Because alleged covered transactions occurred as late as 2001, the claim is not time-barred.

Under New York law a party may obtain an accounting when four factors exist: "(1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting." In re Guardianship of Kent, 729 N.Y.S.2d 352, 353 (Sup. Ct. 2001). The counter-

defendants argue that there was no demand and refusal because documents were produced in response to the counter-plaintiffs's subpoenas.  The counter-plaintiffs, however, have alleged that they have not received all the documentation they requested. This is an issue of fact that cannot be decided on a motion to dismiss.  Accordingly, the Court declines to dismiss the Third Counterclaim.

The Fifth Counterclaim alleges that Bishop and Gray Seifert breached a valid investment advisory contract with Green and Gerry.  Although the parties dispute the relevant statute of limitations, it is well established that the statute of limitations for a breach of contract claims under New York law is six years.  See N.Y. C.P.L.R. § 213(2).  There is no reason to apply the three-year statute of limitation for breach of fiduciary duty to this counterclaim because the counter-plaintiffs have alleged the existence of valid contracts with both Gray Seifert and Bishop and the material breach of those contracts.[14]  (CC ¶ 149-50.)  This counterclaim is therefore distinct from the counterclaim for breach of fiduciary duty and, under the liberal pleading standard of Federal Rule of Civil Procedure 8, it is sufficient to survive a motion to dismiss. Conley, 355 U.S. at 47-48.  Accordingly, while any alleged

---

[14] Bishop's argument that he is not liable on the contracts of his corporation is unavailing for the same reason: the counter-plaintiffs have alleged contracts with Bishop and with Gray Seifert, not merely Gray Seifert.  (CC ¶ 149-150.)

breach prior to March 30, 1998, six years before the
counterclaims were first filed, is time-barred, this
counterclaim cannot be dismissed to the extent a breach of
contract after March 30, 1998 is alleged.[15]

The Seventh Counterclaim alleges that all counter-
defendants are liable to Goldner and Fisher for fraud because of
Bishop's alleged misrepresentations to Green in connection with
her investments made through Bishop & Co.  This claim is also
time-barred to the extent that it alleges fraud prior to March
30, 1998.  The counter-plaintiffs, however, have alleged fraud
up to July 2001, and did plead fraud in connection with Bishop's
procurement of the alleged Note with the particularity required
by Federal Rule of Civil Procedure 9(b).  (CC ¶¶ 106-15, 156-
60.)  The counter-defendants' motion to dismiss the Seventh
Counterclaim is therefore granted to the extent the counter-
plaintiffs alleged fraud prior to March 30, 1998.

The Seventh Counterclaim further alleges that Pro Bono,
Bishop, the Congers, Dockery, Gray Seifert and Legg Mason are
jointly and severally liable for the alleged fraud.  (CC ¶ 160.)
Resolution of these issues requires factual determinations and
the allegations therefore cannot be disposed of on a motion to

---

[15] The Fifth Counterclaim, as well as the Seventh Counterclaim, was asserted
for the first time on March 30, 2004, and does not related back to September
19, 2003, the date of the counter-plaintiffs' original answer with
counterclaims against Pro Bono and Bishop seeking a judgment that they did
not owe Pro Bono on the alleged Note.

dismiss, which accepts the facts alleged as true and tests only the legal sufficiency of the complaint. Cooper v. Parsky, 140 F.3d 133, 140 (2d Cir. 1998). The same is true for the allegations that Pro Bono, Dockery, Gray Seifert, and Legg Mason are liable for Bishop's alleged fraud. (See CC ¶¶ 70-71, 81, 160).

The Eighth through Thirteenth Counterclaims, as well as the Fifteenth Counterclaim, are pre-empted by New York's Martin Act. See N.Y. Gen. Bus. L. §§ 352 et seq. The New York Court of Appeals has held that there is no private right of action under the Martin Act and that the Attorney General's enforcement rights are exclusive. CPC Int'l Inc. v. McKesson Corp., 514 N.E.2d 116, 118-19 (N.Y. 1987). Most New York courts have further held that the act precludes a private right of action for common law claims the subject matter of which is covered by the Martin Act, as is the case with these counterclaims. See Rego Park Gardens Owners Ass'n v. Rego Park Gardens Assocs., 595 N.Y.S.2d 492, 494 (2d Dep't 1993); Eagle Tenants Corp. v. Fishbein, 582 N.Y.S.2d 218, 219 (2d Dep't 1992); Horn v. 440 E. 57th Co., 547 N.Y.S.2d 1, 5 (2d Dep't 1989). The federal courts have, almost without exception, adopted the same position. See, e.g., Marcus v. Frome, 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004); Nanopierce Techs., Inc. v. Southridge Capital Mgmt.

LLC, No. 02 Civ. 0767, 2003 WL 22052894 at *3 (S.D.N.Y. Sept. 2, 2003) (collecting cases).

The counter-plaintiffs cite Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639 (4th Dep't 2001), and Cromer Fin. Ltd. V. Berger, No. 00 Civ. 2498, 2001 WL 1112548 (S.D.N.Y. Sept. 19, 2001), for the proposition that the Martin Act does not preclude common law rights of action. These cases, however, "stand as solitary islands in a stream of contrary opinion," Nanopierce Techs., 2003 WL 22052894 at *4, and are not persuasive because allowing a private cause of action for common law wrongs within the Martin Act's purview is inconsistent with the Attorney General's exclusive enforcement powers in this realm.[16] See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190-91 (2d Cir. 2001); Marcus, 329 F. Supp. 2d at 476 n.4; Nanopierce Techs., 2003 WL 22052894 at *3-4; Granite Partners, L.P. v. Bear, Stearns & Co., Inc., 17 F. Supp. 2d 275, 291-92 (S.D.N.Y. 1998). The Eighth through Thirteenth and Fifteenth Counterclaims are therefore dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In the Fourteenth Counterclaim the counter-plaintiffs seek indemnification from Bishop, Bishop & Co., and Gray Seifert for

---

[16] Unlike Counterclaims Eight through Thirteen and Fifteen, the common law fraud alleged in the Seventh Counterclaim is not "covered" by the Martin Act because it requires an additional element of deceitful intent. See Horn, 547 N.Y.S.2d at 5.

any liability they might have to Pro Bono.  In the absence of an express agreement to indemnify, there are only two grounds for indemnification under New York law.  People's Democratic Republic of Yemen v. Goodpasture, Inc., 782 F.2d 346, 351 (2d Cir. 1986).  "Implied in law" indemnity applies "when there is a great disparity in the fault of two tortfeasors and one of the tortfeasors has paid for a loss that was primarily the responsibility of the other," Id.  That ground is not available in this case because there has been no suggestion that the counter-plaintiffs and the counter-defendants are joint tortfeasors.  The counter-plaintiffs urge that they are entitled to "implied in fact" indemnification, which arises out of "the special nature of a contractual relationship between parties." Id.  Implied in fact indemnification, however, applies where "the proposed indemnitee holds a non-delegable duty to the plaintiff, the responsibility for which he transfers to the proposed indemnitor by agreement."  In the Matter of Poling Transp. Corp., 784 F. Supp. 1045, 1048 (S.D.N.Y. 1992)  Thus, "'[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity.'"  State v. Stewart's Ice Cream Co., Inc., 473 N.E.2d 1184, 1186 (N.Y. 1984) (quoting Restatement, Restitution, § 76).

"No right to implied indemnification exists when the proposed indemnitee retains a duty it owes directly to the plaintiff."  Poling Transp. Corp., 784 F. Supp. at 1048 (citing Rosado v. Proctor & Schwartz, Inc., 484 N.E.2d 1354, 1355 (N.Y. 1985), and Guzman v. Haven Plaza Housing Dev. Fund Co., 509 N.E.2d 51, 55 (N.Y. 1987)).  In the absence of an express contract so providing, it cannot be maintained that the counter-plaintiffs fully transferred any liability they might have to plaintiffs to Bishop, Bishop & Co., and Gray Seifert.  Id.

Moreover, the relationship the counter-plaintiffs had with Bishop, Bishop & Co., and Gray Seifert is not the kind that gives rise to an implied contract for indemnification under New York law.  "Relationships that support implied indemnification include employer/negligent employee, building owner/independent contractor, and motor vehicle owner/negligent driver."  In re Del-Val Fin. Corp. Securities Litig., 868 F. Supp. 547, 553 (S.D.N.Y. 1994) (citing D'Ambrosio v. City of New York, 435 N.E.2d 366, 369 (N.Y. 1982)).

The relationship between these parties is of an entirely different nature.  Bishop, Bishop & Co., and Gray Seifert cannot be said to have contracted with the counter-plaintiffs to assume full responsibility for a duty the counter-plaintiffs owed to Pro Bono.  Indeed, it is from Bishop & Co. that Pro Bono alleges the counter-plaintiffs were unjustly enriched.  It is only

because Bishop & Co. assigned its assets to Pro Bono that Pro
Bono has standing to prosecute its action against the counter-
plaintiffs. Under these circumstances it cannot be concluded
that Bishop, Bishop & Co., or Gray Seifert impliedly agreed to
indemnify the counter-plaintiffs should they be held liable for
a breach of a duty they owed to Bishop & Co. The Fourteenth
Counterclaim is therefore dismissed.

**CONCLUSION**

The counter-defendants' motions to dismiss the amended
counterclaims are **granted in part** and **denied in part**: The First
Counterclaim is **dismissed** as moot. The Second Counterclaim is
**dismissed without prejudice** for lack of subject matter
jurisdiction. The Fourth, Sixth, Eighth, Ninth, Tenth,
Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth
Counterclaims are **dismissed** for failure to state a claim upon
which relief can be granted. The Fifth Counterclaim is
**dismissed** to the extent it alleges breach of contract prior to
March 30, 1998. The Seventh Counterclaim is **dismissed** to the
extent it alleges fraud prior to March 30, 1998.

**SO ORDERED.**

**Dated:  New York, New York**
        **September 30, 2005**

John G. Koeltl
United States District Judge

47