UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PRO BONO INVESTMENTS, INC.,

                              Plaintiff,

              -against-                          03 Civ. 4347 (JGK)

CHRISTINA GREEN GERRY and                        <u>OPINION AND ORDER</u>
ABRAHAM GOLDNER and JOAN FISHER,
Executors of the Estate of Judith H. Green,

                    Defendants.
_____

PRO BONO INVESTMENTS, INC.,

                              Cross-Claimant,

              -against-

LAWRENCE A. BISHOP,

                    Cross-Defendant.
_____

JOHN G. KOELTL, District Judge:

        This case involves a convoluted web of entities created to
manage the investments of several high wealth families, some of
whom treasured anonymity, with the investment adviser Lawrence
Bishop ("Bishop") figuring centrally in the entanglements that
are alleged to have resulted.  At its most basic level, the
lawsuit involves Bishop taking funds from one investment account
and giving or loaning them to two other clients who had separate
accounts and no relationship at all to the first account holder.

The original account holder, whose interests have been assigned, now wants the money back.

The Court conducted a non-jury trial on July 8, July 9, and July 10, 2008. Having considered the evidence, assessed the credibility of the witnesses, and reviewed the parties' post-trial submissions, the Court makes the following findings of fact and reaches the following conclusions of law.

## FINDINGS OF FACT

### The Parties

1.     Plaintiff Pro Bono Investments, Inc. ("Pro Bono Investments") is a Nevada corporation. (Pl.'s Ex. 16.)

2.     Pro Bono Investments is the assignee of the claims and causes of action sued upon in this action against defendants Christina Green Gerry ("Mrs. Gerry") and Abraham Goldner ("Goldner") and Joan Fisher, Executors of the Estate of Judith H. Green ("Mrs. Green"), and against cross-defendant Lawrence A. Bishop ("Bishop") (Pl.'s Exs. 22, 24 and 27; Trial Transcript ("Tr.") at 287.)

3.     The right to receive the proceeds of any recovery in this action belongs to the Residual Holdings Trust, whose beneficiaries are Dr. Richard Conger, deceased, his wife Faith Conger, and their issue, meaning their children, their children's

children and all children thereafter.  (Pl.'s Ex. 32; Tr. at 214.).

4.     Defendants Goldner and Joan Fisher are the Executors of the Estate of Judith Green, (Pl.'s Ex. 9), who died on September 14, 2001. (Revised Joint Pretrial Order ("JPTO") Stipulated Fact 5; Tr. at 71.)

5.     Defendant Mrs. Gerry is the daughter of Mrs. Green.  (Tr. at 139-40.)


## Background

6.     Bishop formed Gray Seifert & Co. ("Gray Seifert"), a money manager for high net worth families, individuals, and institutions, (Tr. at 33), in 1980 with two other individuals.  (Tr. at 32.)  Bishop was executive vice president and later became president.  (Tr. at 32-33.)  In 1994 Gray Seifert was sold to Legg Mason and Gray Seifert became a wholly owned subsidiary of Legg Mason.  (Tr. at 34.)  Bishop remained at Gray Seifert until August 2001.  While Bishop testified that he resigned because Legg Mason became less than enamored with private equities in which Bishop specialized, and because he and Legg Mason were "at loggerheads," the credible testimony is that Bishop was forced to resign because of customer complaints and other irregularities.  (Tr. at 34, 103-104, 106, 108, 109.)

7.    The investment management style of Gray Seifert was to seek capital appreciation through investment in low multiple growth stocks, not dividend current income.  (Tr. at 37-38.)  Accounts maintained at Gray Seifert were discretionary accounts, which meant that the purchases and sales were within the discretion of Bishop and consent of the account holder for investments was not required.  (Tr. at 35-36.)

8.    At Gray Seifert, Bishop managed accounts for, among others, Mrs. Green, Mrs. Gerry and Bishop & Co.  (Tr. at 34-35), all of which accounts were discretionary accounts.  (Tr. at 36-37.)

9.    Neuberger Berman acted as custodian for clients of Gray Seifert.  Neuberger Berman's functions as custodian included holding securities and cash, collecting income, paying out income, and rendering monthly statements.  (Tr. at 40.)

10.    Bishop received copies of Neuberger Berman monthly statements for the accounts he managed, (Tr. at 40), including for the accounts of Mrs. Green, Mrs. Gerry, and Bishop & Co., which he reviewed from time to time.  (Tr. at 41.)


## Bishop & Co.

11.    On November 1, 1986, Bishop & Co., a nominee partnership, was formed pursuant to a Partnership Agreement of that date with Bishop and John Dockery as the partners.  (Pl.'s

4

Ex. 1.) The Partnership Agreement is governed by New York law. (Pl.'s Ex. 1, ¶ 11.) As a nominee partnership, Bishop & Co. held and managed assets of Richard and Faith Conger which they had deposited in Bishop & Co. in the name of Bishop & Co. (Tr. at 59-60, 185.)

12. Pursuant to the Bishop & Co. Partnership Agreement, the partnership's purpose was to hold real and personal property in the name of the partnership "solely for the use and benefit of one or more of the respective Principals," identified as Faith and Richard Conger and their heirs, successors and assigns. (Pl.'s Ex. 1, ¶ 2(b).) The Agreement provided that: "The partnership shall have no beneficial or equitable ownership interest in the assets of the Property. Beneficial and equitable ownership of the assets constituting Property shall be vested at all times in one or more of the Principals [Congers] and any funds which the Partnership may come to hold shall be held entirely for the benefit of the Principals [Congers]." (Pl.'s Ex. 1, ¶ 2(c).)

13. The Partnership Agreement provided that "the Partnership shall for the account of the Principals convey, assign, sell, endorse, or otherwise deal with the Property only upon and in accordance with instructions from one or more of the Principals [Congers] or their agents, and the Partnership shall not for its own account or the account of an individual Partner deal with the Property." (Pl.'s Ex. 1, ¶ 2(b).)

14.    The Congers agreed to this type of arrangement because they wanted to remain anonymous to keep their family names from public records, (Tr. at 60, 174-75), and for convenience of management. (Tr. at 381-82.)  The Congers did not want to hold legal title to their assets.  (Tr. at 180.)

15.    Bishop was the Managing Partner of Bishop & Co. (Pl.'s Ex. 1, ¶ 4(d).)  As Managing Partner, Bishop had control over the assets of Bishop & Co.  (Tr. at 61.)

16.    Bishop was bound by the Partnership Agreement. While Bishop disputed that fact, there is no writing that contradicts the terms of the Partnership Agreement, and Bishop's testimony that he was not bound by the Agreement is unsupported by any credible testimony or documentation.  (Tr. at 70.)

17.     As Managing Partner, Bishop had the sole and complete responsibility to "maintain or cause to be maintained current and complete books and records accounting for all the transactions of or relating to the Partnership."  (Pl.'s Ex. 1, ¶ 6(a).)

18.     Bishop did not fulfill this responsibility.  His testimony that Neuberger Berman kept the books and records of Bishop & Co., (Tr. at 63), is not credible in view of the explicit terms of the Bishop & Co. Partnership Agreement.  (Pl.'s Ex. 1, ¶ 6(a).)  In addition, it was not the function of Neuberger Berman as custodian to maintain books of account for a client of Gray

Seifert, (Tr. at 111-12), nor was it an official function of Gray Seifert to maintain books and records of companies that had accounts at Gray Seifert. (Tr. at 110.) Christopher Elliman ("Elliman"), a vice president, and later president of Gray Seifert, testified that he never saw Bishop & Co. books and records at Gray Seifert. (Tr. at 110-11.)

### Bishop's Transfers to Judith Green and Christina Green Gerry From Bishop & Co.

19.    Mrs. Green opened her Gray Seifert account in 1980 with $1 million, which Bishop managed until he left Gray Seifert in August 2001. (Tr. at 52.)  According to Bishop, he and Mrs. Green were social friends, (Tr. at 54), and he visited her home and was an invited guest at the wedding of her daughter, Mrs. Gerry. (Tr. at 140.)

20.    Bishop managed a trust fund account for Mrs. Gerry that was created under the will of her father and a personal account that was opened when the trust fund made its first scheduled principal payment to her. (Tr. at 56.) Mrs. Green was the trustee of Mrs. Gerry's trust account. (Tr. at 56.) Bishop managed Mrs. Gerry's accounts at Gray Seifert until he left Gray Seifert in August 2001. (Tr. at 58.)

21.    From time to time, Mrs. Green asked Bishop for money to buy specific things. (Tr. at 55.) Her account grew to

about $4 million but at the time of her death, her account's capital balance was less than $500,000. (Tr. at 71-72.)

22. After 1985, Bishop became concerned about the amount of Mrs. Green's requests for money because she was spending at a rate that the balance in her account could not sustain. (Tr. at 78-80.) Mrs. Green had been overspending for years, withdrawing $500,000 per year on an account of about $2 million. At that annual rate of expenditure from her account, Bishop testified reasonably that the account could not be expected to last long. (Tr. at 74-75.) In 1997, Mrs. Green spent approximately $500,000. (Pl.'s Ex. 12.)

23. In 1997, Bishop testified that he offered to provide Mrs. Green with financing against her apartment from an entity he controlled, namely Bishop & Co. (Tr. at 91-92.)

24. Bishop knew that Mrs. Green did not have the personal financial statement to support that type of loan from a commercial banking institution, (Tr. at 93), and that she could not pay her living expenses and did not have income to support the loan. (Tr. at 95-96.)

25. Bishop began to transfer funds from the account of Bishop & Co. to Mrs. Green's account, and he also made more limited transfers to the account of Mrs. Gerry. (Tr. at 93-96, 162.) Transferring those funds was inconsistent with any investment strategy or goal Bishop offered as the investment

manager of the Bishop & Co. account. (Tr. at 37-38.) Bishop
contended that the transfers were simply a loan from Bishop & Co.,
but there was no contemporaneous documentation that the transfers
were a loan; there was no security for any such loan; and the
transfers did not further any interest of Bishop & Co. or its
Principals. It is plain that Mrs. Green and Mrs. Gerry had no
right to the funds that Bishop transferred from Bishop & Co. to
Mrs. Green and Mrs. Gerry. It is also unclear when, if ever, Mr.
Bishop intended to return the funds to the account of Bishop & Co.
(Tr. 85-86, 139.)

26. Mrs. Green did not care from whom the money came.
(Tr. at 92.)

27. The procedure used to transfer Bishop & Co. funds
to Mrs. Green and Mrs. Gerry is not disputed. Mrs. Green
initially made the requests for cash orally and later by fax.
(Tr. at 72-74.) A form was filled out and transmitted to
Neuberger Berman instructing Neuberger Berman to transfer the
funds from the Bishop & Co. account to the bank account of Mrs.
Green. (Tr. at 75-77.) The instruction form identified the
account to be debited (the Bishop & Co. account), the amount, and
the account to be credited. (Tr. at 75-76.) On the wire transfer
forms, the instruction was that the funds were to go to Mrs.
Green's bank account. (Pl.'s Ex. 7.) The entry also identified

that the funds were coming from the Bishop & Co. account. (Tr. at 76-78.)

28. After 1997, Bishop continued to receive requests from Mrs. Green to transfer funds and Bishop continued to transfer Bishop & Co. funds to her. Although Bishop claimed he was lending money to Mrs. Green on the security of her apartment, he did not prepare or have Mrs. Green sign any document, even though he knew in 1997 what was required to obtain a security interest in a co-op apartment. (Tr. at 94.)

29. Bishop transferred Bishop & Co. funds to Mrs. Green typically twice a month at the rate of about $20,000-25,000 per month. (Tr. at 96.)

30. The transfers made by Bishop from Bishop & Co. to Mrs. Green included funds in the neighborhood of $150,000 for Mrs. Gerry's wedding. (Tr. at 141-42.)

31. Between April 30, 1997 and May 31, 2001, Bishop transferred Bishop & Co. funds totaling $1,441,694.97 to Mrs. Green's bank account at the Bank of New York, $6,919.50 to Mrs. Green's bank account at Barclays Bank, and $15,900.00 for a fee owed by Mrs. Green to her accountant, none of which have been repaid. (Pl.'s Ex. 13 at "Updated Analysis" 6; Tr. at 96.) On one occasion, on August 31, 1998, Bishop transferred $12,000 to Mrs. Green's Neuberger Berman account, which was repaid by Mrs. Green in December 1999 in the sum of $12,017.00. (Pl.'s Ex. 13 at

"Updated Analysis" 1.)  The total principal amount paid to Mrs. Green by Bishop & Co. is $1,464,497.47.  (Pl.'s Ex. 13 at "Updated Analysis" Cover Letter.)

32.    Neither Mrs. Green nor Mrs. Gerry had any right to any of the funds that Mr. Bishop transferred from Bishop & Co. to them.

33.    The procedure used by Bishop for transmittal of funds to Mrs. Gerry was the same procedure as he used to transfer funds to Mrs. Green: written instructions were sent to Neuberger Berman, the custodian of the Bishop & Co. assets, to take funds out of the Bishop & Co. account and send them to Mrs. Gerry's bank account.  (Tr. at 138.)

34.    Between April 16, 1999 and April 17, 2001, Bishop had Bishop & Co. transfer a total of $89,230 to Mrs. Gerry's bank account at the Bank of New York, none of which has been repaid. (Pl.'s Ex. 13 at "Updated Analysis" 6.)  Mrs. Gerry had no right to those funds.

35.    The total amount of interest due from the defendants through May 30, 2008, on the amounts transferred to them by Bishop from Bishop & Co. is $1,162,263.12.  (Pl.'s Ex. 14.)  Of the total interest of $1,162,263.12 as of May 30, 2008, it was stipulated at trial that $1,098,204.75 is attributable to transfers from Bishop & Co. to Mrs. Green, and $64,058.37 is

attributable to transfers from Bishop & Co. to Mrs. Gerry. (Tr. at 359.)

36. The stipulated per diem rate of interest with respect to Mrs. Green is $361.11 per day, and the stipulated per diem rate of interest for Mrs. Gerry is $22 per day. (Tr. at 359.)

37. As Managing Partner of Bishop & Co., Bishop was responsible for the transfers from Bishop & Co. to Mrs. Green and to Mrs. Gerry. (Tr. at 196.) Bishop did not seek the authority of the Congers to make the transfers from Bishop & Co. (Tr. at 98-99.)

38. After Bishop resigned from Gray Seifert, Faith Conger, by letter dated November 19, 2001, confirmed that various private equity investments made by Bishop on behalf of the Congers through Bishop & Co., totaling approximately $10 million (including, but not limited to, Synergistics, ABC Dispensing, LBJG, Unapix, Affirmative Equities, Patrick Henry Hotel and Kerry Petroleum), were all made with her full knowledge and consent and she affirmed them in all respects. (Bishop Exs. 4, 5; Tr. at 270-71.)

39. Prior to Mrs. Conger's letter of November 19, 2001, the Congers were furnished by Gray Seifert with detailed schedules listing all of the private equity investments made for them by Bishop about which any question had been raised, as well

as the $1.6 million loan made to Mrs. Green with funds of Bishop &
Co. (Bishop Ex. 4; Tr. at 121-25). A November 9, 2001 letter
from Mr. Elliman to Mrs. Conger specifically noted that Bishop &
Co. had a $1.6 million loan outstanding to Judith Green and noted
that a decision had to be made as to what to do with that claim.
(Bishop Ex. 4.)

40.   Mr. Elliman of Gray Seifert testified that some
ambiguity existed in his mind as to whether Faith Conger's
confirmatory letter of November 19, 2001 encompassed confirmation
of the Green loan. He nevertheless acknowledged (and the record
clearly shows) that, although the Congers were furnished detailed
information regarding the loan, they never communicated any
objection concerning the fact that the loan had been made. (Tr.
at 122-24.)

41.   At their depositions, Dr. Conger testified (and
Mrs. Conger concurred) that they "applauded" Bishop for making the
loan to Mrs. Green. (Tr. at 398.) While Dr. Conger testified he
"presumed" Bishop had told the Congers that the loan had been made
with Bishop & Co. funds (but then said he did not "know"), the
Congers knew all the relevant facts at the time of their
depositions, because they had been furnished detailed schedules
regarding all questioned investments, including the $1.6 million
Green loan, shortly after Bishop left Gray Seifert in 2001,
several years before their depositions in this action. (Tr. at

398; Bishop Ex. 4.)  The record is thus clear that at least by November 9, 2001, Mrs. Conger was aware that a transfer of $1.6 million had been made by Bishop from the funds of Bishop & Co. to Mrs. Green and was treated as a loan.  There was no objection from Dr. or Mrs. Conger.  However, it is also clear that there is no evidence that the Congers treated the transfer as a gift or waived any right to recovery of those funds.

42.    Mrs. Green did not make any investment in Bishop & Co. (Tr. at 138-39, 106-07; Pl.'s Ex. 2.)  The transfers from Bishop & Co. to Mrs. Green were not repayments of any investment made by her.  (Tr. at 277.)  There is no evidence that at the time of the transfers of funds from Bishop & Co. to Mrs. Green and Mrs. Gerry that Bishop & Co. was indebted to either of them, that they had ever "invested" any money in Bishop & Co., or that the transfers to Mrs. Green were a return of capital.  There is no evidence of any consideration for the transfers from Bishop & Co. to Mrs. Green and Mrs. Gerry.

43.    There is no evidence of any claim by the defendants to legal title to the funds transferred to Mrs. Green and Mrs. Gerry by Bishop from Bishop & Co.

44.    The defendants' own expert reconciled Mrs. Green's Neuberger Berman account with Neuberger Berman records and determined that all funds in the account had been accounted for and there were no missing funds of Mrs. Green that could

have been used for investments through or in Bishop & Co.
(Pl.'s Ex. 2.)

45.     Bishop did make statements to Mrs. Green about
her investments that were false.   On December 14, 1998, Bishop
wrote a memo to Mrs. Green on the stationery of Gray Seifert, in
which, among other things, Bishop advised Mrs. Green with
respect to ABC Dispensing Technologies: "290,000 shares are held
for you in my Partnership Bishop & Co."  (Defts.' Ex. U.)  The
undisputed evidence is that Mrs. Green made no investments in or
through Bishop & Co.  (Pl.'s Ex. 2; Tr. at 138-39, 106-07.)


### The Note from Judith Green

46.     In the second quarter of 2001, Elliman was
president of Gray Seifert.  (Tr. at 102.)  Elliman and Bishop
swapped positions, with Elliman going from vice president to
president and Bishop going from president to vice president.
(Tr. at 102-03.)

47.     Gray Seifert initiated an investigation of the
portfolios managed by Bishop because a customer commenced a
litigation complaining that Bishop made some investments in
companies which had a market value that was not publicly
determined.  (Tr. at 103-04.)

48.     In the course of the Gray Seifert investigation,

it was discovered that monies were being transferred from the Bishop & Co. account to Mrs. Green. (Tr. at 105.) Elliman testified that it was unusual to find funds of one client's account being transferred to another client. (Tr. at 106.)

49.     Bishop told Elliman that the transfers from the Bishop & Co. account to Mrs. Green were loans. (Tr. at 107.) Elliman instructed Bishop on advice of counsel that the loans had to stop. Elliman testified that there was no documentation for these loans, there were issues of whether the Congers had approved of the transfers, and there was a general SEC compliance issue. (Tr. at 108.) The Gray Seifert investigation also found no legal documentation for transfers of funds from the Bishop & Co. account to Mrs. Gerry. (Tr. at 109.)

50.     Gray Seifert removed Bishop's authority to make the transfers by instructing him to stop and ultimately by asking him to resign. (Tr. at 109.)

51.     Elliman suggested to Bishop that he obtain a Note from Mrs. Green and Bishop said that he would do so. (Tr. at 112.) Elliman did not know what the contents, the term, or the terms of the Note would be. (Tr. at 113-14.)

52.     Bishop testified that Pl.'s Ex. 8 is a copy of a Promissory Note that Mrs. Green signed. (Tr. at 146.) The purported note, dated July 12, 2001, stated that Mrs. Green promised to pay Bishop & Co. "the principal sum as may be

outstanding and due BISHOP & CO from time to time as carried on the Company's books, and interest thereon at the rate of 8%, per annum . . . ." The Note indicated that Mrs. Green had pledged the securities and cash in her account at Neuberger & Berman as well as a security interest in the shares of capital stock of her cooperative apartment and the Proprietary Lease for the apartment. (Pl.'s Ex. 8 at 1-2.) There was no witness to the signing of the Note other than Bishop. Pro Bono Investments, Inc. v. Gerry, No. 03 Civ. 4347, 2005 WL 2429777, at *6 (S.D.N.Y. Sep. 30. 2005). The Note was purportedly signed about two months before Mrs. Green died. No efforts were ever made to perfect any of the security interests referred to in the purported Note. The original of the purported Note was not produced at trial and no one testified credibly as to how the original of the purported Note came to disappear. The Court has already determined that Pro Bono Investments as the successor to Bishop & Co. could not rely on the Note to establish a claim for breach of contract or sue on the Note against the Estate of Mrs. Green because it could not establish the authenticity of the Note, which depended on Mr. Bishop's testimony about a transaction with Mrs. Green which would be barred by New York's Dead Man statute. See Pro Bono , 2005 WL 2429777. Pro Bono Investments seeks to rely on the Note, however, in its claims against Mr. Bishop, arguing oddly that Mr. Bishop was negligent

in his drafting and obtaining the Note, in failing to perfect the security interest referred to in the Note, and in failing to preserve and protect the original of the Note. These claims by Pro Bono Investments against Bishop fail for the reasons explained below. It is therefore unnecessary to determine finally whether Mrs. Green ever signed the Note, and if so, what she thought she was signing. It is sufficient to point out that the only evidence that Mrs. Green even signed the Note is the testimony of Mr. Bishop who, at the very least, was an interested party in the transaction and who had previously misrepresented to Mrs. Green what her investment in Bishop & Co. was.

53.     Bishop acknowledged at trial that Mrs. Green was not creditworthy and did not have the income to repay the loans. While he considered it important for Bishop & Co. to have its loans secured by Mrs. Green's apartment, he took no steps to perfect a security interest in the apartment. (Tr. at 161-62.)

54.     Bishop never told the Congers he was having the loans to Mrs. Green documented or that he obtained the Note, (Tr. at 159-60), or that a security interest was being sought by the Note. (Tr. at 161.)

55.     At trial, Bishop did not attempt to explain how the loans to Mrs. Green and Mrs. Gerry were consistent with the investment goal of capital appreciation.

## The Congers Request an Investigation of Bishop

56.     In 2002, Logan Fulrath, Jr., Esq. ("Fulrath") and Gary Yanker, Esq. ("Yanker") were consulted by the Congers about their estate plans and their ideas for a perpetual trust for the benefit of their issue.  (Tr. at 178-79.)  The Congers' purpose was to create a fund to benefit their four children and grandchildren living and to be born.  (Tr. at 179-80.)  Fulrath, an experienced trusts and estates attorney, has been performing professional services for the Congers since 1982.  (Tr. at 173-74.)

57.     The Coronado Trust, (Pl.'s Ex. 17), was then established for the benefit of the Congers' family, (Tr. at 181-82), and served as a repository for Conger assets.  (Tr. at 184.)

58.     The Congers requested that Pro Bono Investments be created, (Tr. at 233), as a management entity to administer the assets of the Coronado Trust.  (Tr. at 183-84.)

59.     By September 18, 2002, Bishop was president of Pro Bono Investments, which was the trustee of the Coronado Trust.  (Pl.'s Ex. 17.)  Bishop was also the sole director and shareholder of Pro Bono Investments.  (Tr. at 182-85.)

60.     Criticisms of Bishop's performance began to

surface.  In managing Bishop & Co., Bishop reported to Dr.

Conger in a general manner, informally and perfunctorily

indicating all was well.  (Tr. at 382-83.)  Bishop did not

provide specific information to the Congers concerning the

investments of Bishop & Co., (Tr. at 383), and Bishop became

unsatisfactory to the Congers' children, who felt Bishop had too

much power and were critical of losses suffered at Bishop & Co.

(Tr. at 388-89.)

61.     In 2002, Fulrath and Yanker were requested by the

Congers to undertake a review of the investments made by Bishop

& Co. and of the management by Bishop & Co. of the Congers'

assets.  (Tr. at 186.)

62.     During this investigation, Fulrath and Yanker

spoke to Bishop, obtained records from Neuberger Berman

concerning Bishop & Co., examined these records, and

investigated  the investments that had been made by Bishop.

(Tr. at 187.)

63.     Dr. Conger had expected Bishop to invest

conservatively and properly in blue chip investments.  (Tr. at

399.)  In contrast to the Congers' expectations, Fulrath found

Bishop's investments to be "unusual," including stocks which

were not publicly traded, and he also found significant losses

which were between $20-22 million.  (Tr. at 188.)  Fulrath also

found transfers to unknown entities and to various individuals (Tr. at 188-89.)

64.     In reviewing the Bishop & Co. records in the course of the investigation of Bishop & Co., Fulrath found evidence of transfers from Bishop & Co. to Mrs. Green and to Mrs. Gerry.  (Tr. at 192.)

65.     Fulrath inquired about these transfers and learned that there was no blood relationship between the Congers and the Greens and the Congers did not know the Greens.  (Tr. at 192.)

66.     Bishop told Fulrath the transfers from Bishop & Co. to the Greens were loans secured by Mrs. Green's co-op apartment and by her Neuberger Berman account.  (Tr. at 193.)

67.     Fulrath did not consider these loans to be appropriate investments for Bishop & Co. funds because they did not yield income or show a likelihood of appreciation; the security was questionable; they were not listed on any public exchange; and they were not rated fixed income securities.  (Tr. at 193-95.)

68.     Fulrath reported his findings to the Congers, as a result of which, on December 30, 2002, (a) Bishop was replaced as sole shareholder and director of Pro Bono Investments by Yanker and Fulrath, (b) Bishop resigned as an officer of Pro Bono Investments, (c) Yanker and Fulrath became officers of Pro

Bono Investments, and (d) Bishop had no further role in the management of Pro Bono Investments. (Tr. at 189-91; Pl.'s Ex. 20.) In addition, Fulrath and Yanker were asked by the Congers to recover those assets that had been devalued or under contest, including loans in default. (Tr. at 415-16.)

69.     Since December 30, 2002, Fulrath has been an officer, director and shareholder of plaintiff Pro Bono Investments. (Tr. at 191.)

## The Estate of Judith Green Fails to Pay the Debt

70.     In January 2003, Fulrath spoke to Goldner, the executor of Mrs. Green's Estate, in an effort to have Mrs. Green's Estate pay the debt to Bishop & Co. Upon learning that Mrs. Green's apartment would be sold, Fulrath spoke to Goldner who said that if it was a valid debt, he would hold $1.5 million in escrow from the proceeds of the apartment sale, but no payment was made by the Estate. (Pl.'s Ex. 10; Tr. at 198-200.)

71.     Goldner requested that Fulrath make a written note of their meeting and Fulrath did so. Fulrath's notes of his January 15, 2003 meeting with Goldner confirm that Goldner stated that "more than adequate funds will be available to pay the claims of Bishop & Co. and Larry Bishop from the net proceeds of the sale of . . . [Judith Green's] co-operative apartment, . . . a sum not to exceed $1,500,000," and that

based on that representation, Fulrath had "no objection to the closing." (Pl.'s Ex. 10.) Fulrath understood that the escrow would only be for a brief period, weeks perhaps, because Goldner wanted to be sure of the assets and other liabilities of the estate of Judith Green, but no payment was made by the Estate. (Tr. at 200-01.)

## The Assignment to Pro Bono Investments

72.     No payment has been made by Mrs. Gerry on the transfers which Bishop made to her from Bishop & Co. (Pl.'s Ex. 13.)

73.     On February 12, 2003, the Congers revoked the nominee agreement with Bishop & Co. and directed that "all assets of the Principals standing in the name of [Bishop, Dockery and Bishop & Co.]" be transferred to Pro Bono, LLC, a Nevada Limited Liability Company. (Pl.'s Ex. 22; Tr. at 203-04.)

74.     On February 12, 2003, Bishop, Dockery, Yanker and Fulrath signed an "Assignment, Consent, And Direction To Transfer" which provided that "all assets standing in the name of . . . Bishop & Co., are hereby assigned, transferred and conveyed to Pro Bono, LLC . . . ." (Pl.'s Ex. 24; Tr. at 205.)

75.     The phrase "all assets" in the assignment of all

the assets of Bishop & Co. to Pro Bono, LLC was not qualified. (Pl.'s Ex. 24.)  It includes all claims, causes of action, and lawsuits belonging to Bishop & Co.  (Tr. at 295-96.)  It would make no sense for all of the physical assets to have been transferred out of Bishop & Co to Pro Bono, LLC but to have left the right to bring claims and causes of action relating to those assets in Bishop & Co. without any language suggesting that there was such a reservation.

76.    After the termination of Bishop & Co.'s nominee relationship and the transfer of Bishop & Co.'s assets to Pro Bono, LLC, Bishop & Co. ceased to function, (Tr. at 204), Bishop performed no functions as Managing Partner of Bishop & Co., (Tr. at 66-67), and Bishop's authority as Managing Partner of Bishop & Co. was terminated. (Tr. at 166.)

77.    In order to separate out the contested assets from other Conger assets, (Tr. at 207, 234), on April 13, 2003, Pro Bono, LLC assigned to plaintiff Pro Bono Investments "all claims, demands, causes of actions, rights to damages . . . of whatever kind or nature, whether arising at law or in equity, whether known or unknown, whether now existing or hereafter arising, whether accrued or unaccrued, whether foreseeable or unforeseeable, and whether ordinary or extraordinary in nature." (Pl.'s Ex. 27.)  The assignment further provided that all

monetary proceeds, less expenses, from pursuing any claims were assigned, transferred and conveyed to Pro Bono Investments.

78.     After the assignment from Pro Bono, LLC to Pro Bono Investments, in a further effort to collect the debt due from Mrs. Green and Mrs. Gerry, Fulrath met with the attorneys for the Estate, who said it should and would be paid and that they would respond within a week. (Tr. at 201-02.) However, no payment has been made. Litigation ensued.

79.     When payment of the debt was not made by the Green Estate, a claim was filed by Pro Bono Investments in the Surrogate's Court, New York County in Mrs. Green's Estate proceedings, which was contested; further proceedings were stayed pending the outcome of this action. (Tr. at 202-03.)

80.     On September 30, 2003, Pro Bono Investments assigned to Residual Holdings LLC, a Nevada limited liability company, all rights to receive proceeds resulting from any claims previously assigned to Pro Bono Investments from Pro Bono, LLC, including the right to receive proceeds for any claims arising from the loans to Mrs. Green and Mrs. Gerry. Pro Bono Investments retained the right to pursue any causes of action and legal claims against any third party. (Pl.'s Ex. 30.)

81.     This was done because the Congers wished to

create an entity to receive the proceeds of contested assets, (Tr. at 209), and so that the Congers would be further insulated from litigation.  (Tr. at 430-31.)


### The Residual Holdings Trust

82.    On September 18, 2003, Pro Bono, LLC, the owner of the units of Residual Holdings LLC, assigned the rights to such assets to the Residual Holdings Trust, which made the Residual Holdings Trust the owner of Residual Holdings LLC. (Pl.'s Ex. 37; Tr. at 211-12.)

83.    The Residual Holdings Trust is an irrevocable trust which is governed by the laws of the State of Nevada. (Pl.'s Ex. 32; Tr. at 213.)

84.    The Residual Holdings Trust was set up on the request of the Congers.  (Tr. at 248.)  The Residual Holdings Trust was formed in response to the Congers' request for further separation of their assets from them.  They wanted a separate entity to hold contested assets.  (Tr. at 217-18.)  The Trust instrument recites that the settlors of the Trust are Yanker and Fulrath on behalf of the settlors of the Coronado Trust.  The Instrument also indicates in turn that the settlors are the Congers.  It also recites that the Congers have four children and that the beneficiaries of the Trust are the Congers and their issue.  (Pl.'s Ex. 32 at I-1.)  The Trust instrument

recites that the Settlor relinquishes all rights and powers in the Trust Estate not expressly retained and expressly declares the Trust to be irrevocable.  (Pl.'s Ex. 32 at I-6.)  Yanker and Fulrath are Investment Trustees and Independent Trustees of the Trust and Matthew Woodhead is the Administrative Trustee. (Pl.'s Ex. at I-1.)

85.     The four children of the Congers, who are beneficiaries of the Residual Holdings Trust, have each received an interim distribution from the Residual Holdings Trust in the sum of $10,000 each.  (Tr. at 335.)

86.     There is no evidence in the record that the Congers children do not wish to receive the proceeds of any judgment entered in favor of the plaintiff in this litigation and those parties and their unborn issue are not before this Court.

87.     To the extent any question is to be raised concerning the performance of the Trustees of Residual Holdings Trust, as a trust governed by the laws of Nevada, the beneficiaries are entitled to obtain an accounting through an accounting proceeding initiated in Nevada pursuant to Nevada Revised Statute 153.031.  See Nevada Revised Statute 153.031.

88.     The Congers encouraged Fulrath and Yanker to pursue litigation.  (Tr. at 262.)  Dr. Conger liked the litigations but did not want to be a part of them.  (Tr. at 267.)  It is apparent that Dr. Conger was aware of the actions brought by Pro Bono Investments in an attempt to recover monies.  (Tr. at 236, 298.)  Dr. Conger favored bringing this litigation.  (Tr. at 372.)

89.     The Congers left it to the discretion of Fulrath and Yanker whether to sue Bishop.  (Tr. at 297.)  Dr. Conger affirmed Fulrath's actions, and had encouraged Yanker and Fulrath over the two years prior to Dr. Conger's August 30, 2006 deposition.  (Tr. at 317-19.)

90.     At his deposition in August 2006, Dr. Conger, who is now deceased, testified that he opposed this litigation and had done so repeatedly over the years and had revoked the authority of Yanker and Fulrath. (Tr. at 400-05.)  Fulrath testified credibly, however, that Dr. Conger was aware of the action and encouraged the lawsuit.  (Tr. at 236, 298.)  Dr. Conger's contrary statements at his deposition are explainable by his clear desire not to have been dragged personally into the litigation, not to have his family's anonymity compromised which was so central to the structures that had been established, and

28

his desire to delegate the handling of their financial affairs to others. (Tr. at 400-02.) In fact, Dr. Conger does not recall any specific conversations with Yanker and Fulrath. (Tr. at 405.)

91.     Yanker received a letter from Ken Page of Baker & McKenzie in November 2005 revoking the powers of attorney from the Congers to Yanker. Prior to the receipt of this letter, Yanker had not been advised that anyone wished to revoke the powers of attorney from Dr. Conger or Faith Conger. (Tr. at 420-21.) This was the first writing expressing possible dissatisfaction by the Congers with Fulrath and Yanker.

92.     The revocation of the power of attorney does not affect the power of Pro Bono Investments to continue prosecuting this action because the authority to initiate and maintain the lawsuit came from Pro Bono Investments and the assignments to it. (Pl.'s Exs. 22, 24, 27; Tr. at 421, 424.) Moreover, the proceeds of the litigation had been assigned to the Residual Holdings Trust, an irrevocable trust, whose beneficiaries were the Congers and their issue.

93.     When Fulrath and Yanker learned during this litigation that the authority of Pro Bono Investments, a Nevada corporation, to prosecute this action was being questioned, they sought and received an opinion from Nevada attorneys. (Tr. at 215-16, 422, 424.) The Court did not receive the opinion in

evidence because it was hearsay, but the fact that Fulrath and Yanker sought the opinion of counsel is at least evidence of their good faith in pursuing the litigation. The documents reflect that Pro Bono Investments has the right to pursue the litigation.

### The Settlement Agreement in the Gray Seifert Action

94.     On or about April 22, 2003, Pro Bono Investments brought an action against Gray, Seifert & Company, LLC and Legg Mason, Inc. (the "Prior Action"), in which Pro Bono Investments asserted much, if not all, of the same alleged misconduct by Bishop as is asserted by Pro Bono Investments in the present action. (Bishop Exs. 1, 2.)

95.     In the Prior Action, the claims for relief asserted by Pro Bono Investments included, as in the present case, claims for fraud, breach of fiduciary duty, conversion, and negligence, based on investments made by Bishop on behalf of Faith and Richard Conger through Bishop & Co., and transfers of funds Bishop caused to be made from Bishop & Co. to Christina Green Gerry and Judith Green, for which Judith Green signed a Promissory Note. (Bishop Exs. 1, 2.) For example, the Amended Complaint specifically alleged: "Judith Green, a friend of Gray Seifert owner and officer Bishop was also a Gray Seifert client. On information and belief, defendants invested Green's money in

some of the same entities that plaintiff's money was invested in and when these investments failed, defendants used plaintiff's money to partially repay Green her investment. Beginning in at least 1991, defendants made numerous wire transfers of funds to Green and her daughter in the amount of at least $1.6 million, exclusive of interest. Green signed a promissory note that states an 8% interest rate but contains no face value or principal amount and no term." (Bishop Ex. 1, ¶ 10.) The Amended Complaint also alleged that the defendant invested the funds of Pro Bono Investments in questionable investments and made loans to various people. The Amended Complaint alleged, for example, that the defendants invested in excess of $12 million of Pro Bono Investments' funds in an entity called Affirmative Equities Corporation which was allegedly a Ponzi scheme. (Bishop Ex. 1, ¶ 9.) The Amended Complaint sought in excess of $16 million in damages. (Bishop Ex. 1.)

96.      On or about September 3, 2003, Pro Bono Investments settled the Prior Action pursuant to a written settlement agreement (the "Settlement Agreement") signed by Yanker and Fulrath on behalf of Pro Bono Investments and by Yanker as attorney-in-fact on behalf of the Congers. (Bishop Ex. 3.)

97.      Pursuant to the Settlement Agreement:

(a) Pro Bono Investments was paid $1.2 million in full settlement and compromise of any and all claims which had been or could have been asserted in the Prior Action, (Bishop Ex. 3, ¶ 1.1);

(b) Pro Bono Investments, on its own behalf and on behalf of its predecessors, successors and assigns, including but not limited to Bishop & Co., and the Congers, on their own behalf and on behalf of all entities owned and/or controlled by the Congers (the "Releasors") gave a general release (the "General Release") in favor of Gray Seifert and Legg Mason and their related persons and entities, including their then-current, former and future controlling members, directors, officers, employees and agents (the "Releasees"), (Bishop Ex. 3, ¶ 2.1);

(c) The General Release was the broadest possible release.  It included all claims that the Releasors had, now have or hereafter can, shall or may have, by reason of any matter or cause whatsoever from the beginning of time to the date of the Settlement Agreement.  It was not limited to any claims set out in the Complaint and included, but was not limited to, any and all claims that had been or could have been asserted in the Prior Action or otherwise,(Bishop Ex. 3, ¶ 2.1);

(d) Yanker warranted that he was authorized to enter into the Settlement Agreement on behalf of both Pro Bono Investments and the Congers, (Bishop Ex. 3, ¶ 2.2);

(e) Pro Bono Investments and the Congers covenanted and agreed not to bring any further claim or action related in any way to the management by Gray Seifert of any of their assets or the accounts of Bishop & Co., (Bishop Ex. 3, ¶ 2.3); and

(f) Pro Bono Investments and the Congers further agreed to defend, hold harmless and indemnify the Releasees against any and all monetary losses, liabilities, judgments, settlements, damages, fees, liens, costs, expenses and claims, including but not limited to attorneys' fees, resulting or arising from or incurred in connection with any claim, suit, action, cause of action or proceeding thereafter brought against Releasees related in any way to the management by Gray Seifert of any of their assets or the accounts of Bishop & Co. (Bishop Ex. 3, ¶ 2.3.)

98.     As a founder and former officer, director, and employee of Gray Seifert at the time the Settlement Agreement was entered into, Bishop was plainly one of the Releasees under the Settlement Agreement.  Indeed, the allegations in the Amended Complaint dealt directly with his actions in connection with the accounts of Bishop & Co. and Bishop's role in investing

the assets of Bishop & Co., which the Amended Complaint specifically attributed to Bishop as an owner and officer of Gray Seifert. (See Bishop Ex. 1.)

99. Fulrath testified that no part of the $1.2 million duplicated the money being sought in this lawsuit. (Tr. at 243.) Yanker also testified that in the course of the negotiations of the settlement, he indicated that Pro Bono Investments would pursue the claims against the Greens separately. (Tr. 427-28.) The Release is clear and parol testimony could not be used to vary the express terms of the Release, but in any event this testimony does not alter the terms of the Release. Mrs. Green and Mrs. Gerry were not released parties under the Settlement Agreement, (see Bishop Ex. 3), and there is nothing in the Settlement Agreement that would preclude Pro Bono Investments from pursuing its claim for the return of funds from Mrs. Green and her daughter. Mr. Bishop, on the other hand, was plainly a Releasee under the Settlement Agreement and there is nothing in the testimony that suggests he was not. The claims by Pro Bono Investments against Mr. Bishop were therefore released.

100. Because Bishop is a Releasee under the Settlement Agreement, Bishop was expressly indemnified by Pro Bono Investments against any and all monetary losses, including attorneys' fees and expenses, incurred in connection with any

claim, suit, action, cause of action, or proceeding that might be brought against him related in any way to, among other things, the management by Gray Seifert of any of the assets of Pro Bono Investments or its related parties, which would include Bishop & Co., or the accounts of Bishop & Co. Therefore, Bishop is entitled to recover from Pro Bono Investments the costs and expenses, including attorneys' fees, incurred by him in the present action.

101.   Pro Bono Investments argues that Bishop has not filed any pleading, either as a claim or as an affirmative defense, in which he seeks attorneys' fees pursuant to the indemnification provision of the Settlement Agreement in the Gray Seifert Action. However, Bishop's claim for such indemnification was asserted as a claim in the Revised Joint Pre-Trial Order, (JPTO at 7), and Pro Bono Investments consented that the claim was in the case to be tried although it did not concede that it was liable for such a claim. The Settlement Agreement makes it clear that Pro Bono Investments is liable for such fees under the Settlement Agreement and the parties have agreed to submit affidavits to establish the amount of such fees. (Tr. at 227-28.)

<u>Sanctions And Attorneys' Fees</u>

102.    By Opinion and Order, No. 03 Civ. 4347, 2005
WL 2429787, at *17 (S.D.N.Y. Sept. 30, 2005), this Court
dismissed, among other claims, defendants' counterclaims
alleging fraud claims pursuant to Section 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule
10(b)(5), 17 C.F.R. § 240.10b-5, promulgated thereunder.  The
Court denied without prejudice as premature applications for
sanctions pursuant to § 21D of the Private Securities Litigation
Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  <u>See</u> No. 03 Civ.
4347, 2005 WL 2429767, at *6 (S.D.N.Y. Sep. 30, 2005).
Subsequent to the entry of these Findings of Fact and
Conclusions of Law, the parties can brief the recovery of such
fees and the appropriate amount.


B.   <u>CONCLUSIONS OF LAW</u>

1.    The Court has jurisdiction based on diversity of
citizenship for the claim of unjust enrichment by Pro Bono
Investments against the defendants.  <u>See</u> 28 U.S.C. § 1332.  The
Court has jurisdiction over the cross-claims between Pro Bono
Investments and Bishop pursuant to supplemental jurisdiction.
<u>See</u> 28 U.S.C. § 1367.

2.    The plaintiff has the legal authority and standing to pursue the claims set forth in this action against the defendants and the cross-defendant.

The plaintiff can trace a clear line of authority for its standing to bring the present claims.  On November 1, 1986, the Congers created Bishop & Co. as a nominee partnership.  The Congers assigned, transferred, and conveyed assets to Bishop & Co.  (Findings of Fact ¶¶ 11-14.)  On February 12, 2003, the Congers revoked the nominee agreement with Bishop & Co. and directed that all assets held in Bishop & Co. be transferred to Pro Bono, LLC.  Accordingly, using unqualified language, Bishop & Co. assigned, transferred, and conveyed all of the assets standing in the name of Bishop & Co. to Pro Bono, LLC.  (Findings of Fact ¶¶ 73-74.)  On April 13, 2003, Pro Bono, LLC transferred and assigned to the plaintiff, Pro Bono Investments, all claims, demands, causes of actions, and rights to damages of whatever kind or nature, whether arising at law or equity, known or unknown.  (Findings of Fact ¶ 77.)  On September 30, 2003, Pro Bono Investments assigned to Residual Holdings LLC all rights to receive proceeds resulting from any claims previously assigned to Pro Bono Investments from Pro Bono, LLC, including the right to receive proceeds for any claims arising from the loans to Mrs. Green and Mrs. Gerry.  However, Pro Bono Investments retained the right to pursue any causes of action

and legal claims against any third party. (Findings of Fact ¶ 80.) On September 18, 2003, Pro Bono, LLC, the owner of the units of Residual Holdings LLC, assigned the rights to such assets to the Residual Holdings Trust, which made the Residual Holdings Trust the owner of Residual Holdings LLC. (Findings of Fact ¶ 82.)

Bishop and the defendants argue that the plaintiff lacks standing to bring the present claims. Between them, Bishop and the defendants challenge the various links in the chain of assignments that gives the plaintiff the authority to prosecute the claims. First, they argue that Bishop & Co. never possessed any assignable claims, and thus the assignment of assets from Bishop & Co. to Pro Bono, LLC could not have included the claims at issue here. Second, they argue that the language of the assignment of Bishop & Co.'s assets to Pro Bono, LLC was not sufficiently explicit to include an assignment of claims, even assuming such claims were possessed by Bishop & Co. and assignable to Pro Bono, LLC. Third, they argue that even if the various assignments were sufficient to confer standing on the plaintiff, the Congers revoked that standing. Each of these arguments is without merit.

With respect to the first argument, Bishop & Co. had the right to sue and to assign claims at the time when all of its assets were assigned to Pro Bono, LLC. Under New York law, a

partnership has the right to sue and thus has a right to pursue
a claim.  See N.Y. C.P.L.R. § 1025.  It is also clear that under
New York law, claims can be assigned.  See, e.g., Banque Arabe
et Int'l D'Investissement v. Maryland National Bank, 57 F.3d
146, 151-52 (2d Cir. 1995).

There is nothing in the Partnership Agreement that
suggested that Bishop & Co. did not have these basic attributes
of a partnership.  Bishop and the defendants point out that
Bishop & Co. had no beneficial or equitable ownership interest
in the property held by it.  But neither Bishop nor the
defendants cite any legal authority for the proposition that a
nominee partnership of this nature is legally incapable of suing
and assigning claims of the partnership.  The Partnership
Agreement is clear only that Bishop & Co. had "no beneficial or
equitable ownership in the assets of the Property"; it says
nothing to limit Bishop & Co.'s power to prosecute claims in
furtherance of holding those assets, which was its business
purpose.  (Pl.'s Ex. 1 at ¶ 2(c).)  Indeed, the Partnership
Agreement indicates that the partnership possessed assignable
claims in ¶ 14, in which it states that "[n]o person other than
a Partner shall have any legal or equitable right, remedy or
claim under or in respect of this Agreement." (emphasis added).
(Pl.'s Ex. 1 at ¶ 14.)  This statement indicates that the

partnership possessed assignable claims, because it reflects the need to distinguish persons that do not possess such claims.

The Partnership Agreement also states that "[t]he Partnership shall for the account of the Principals convey, assign, sell, endorse, or otherwise deal with the Property only upon and in accordance with instructions from one or more of the Principals or their agents . . . ." (Pl.'s Ex. 1 at ¶ 2(b).) The litigations are efforts by Pro Bono Investments, as the successors to Bishop & Co., to deal with the property of the partnership – namely, to recover assets of the partnership. It would be remarkable if the partnership, without any statement in the Partnership Agreement, was deprived of the right to protect the partnership assets or to recover those assets through litigation. As explained above, the credible evidence in the record has established that Pro Bono Investments had the permission of the Congers to pursue this litigation at the time the claims were brought. (See Findings of Fact ¶¶ 88-93.)

Bishop also contends that Bishop & Co. did not possess and thus could not assert or assign any claims for breach of the Partnership Agreement. Whether this is true is irrelevant, because the plaintiff has brought claims of unjust enrichment against the defendants and, for the reasons explained below, has no claim against Bishop whether in contract or tort.

With respect to the second argument, the language of the assignment from Bishop & Co. to Pro Bono, LLC, which provided that "all assets standing in the name of . . . Bishop & Co., are hereby assigned, transferred and conveyed to Pro Bono, LLC," included an assignment of claims.  Findings of Fact ¶¶ 74-75. The cases cited by Bishop do not suggest otherwise because they do not deal with comparably broad and explicit assignments.  <u>See Tycon Tower I Investment Limited Partnership v. John Burgee Architects</u>, 651 N.Y.S.2d 637, 638-39 (App. Div. 1996) (no written or explicit assignment existed at all); <u>Gruber v. Victor</u>, No. 95 Civ. 2285, 1996 U.S. Dist. LEXIS 12567, at *43-44 (S.D.N.Y. Aug. 28, 1996) (involving assignment of a contract, not assignment of assets or "all assets" as in this case); <u>The Fund of Funds, Ltd. v. King</u>, No. 74 Civ. 1981, 1979 WL 799, at *2 (S.D.N.Y. June 29, 1976) (suggesting that language assigning "all or any interests to which [a party] is beneficially entitled, acquired or derived through [a certain account]" would be sufficient to assign related tort claims, but holding that there was no assignment of claims because this language was not used in all of the relevant assignments of interests).  Indeed, even Bishop acknowledges that under what he calls "appropriate circumstances," the words "all assets . . . encompass assignable claims."  (Bishop Post-trial Br. 12.)

Bishop misinterprets New York State law, which actually favors the plaintiff's conclusion that the broad assignment of "all assets" from Bishop & Co. to Pro Bono, LLC encompassed the right to bring claims. In Banque Arabe, 57 F.3d at 151-52, the Court of Appeals for the Second Circuit, applying New York law, held that an assignee had standing to bring causes of action in contract and tort formerly held by an assignor, based on an assignment that was broad but did not explicitly assign causes of action, much like the assignment in this case. The assignment in Banque Arabe provided: "[The assignor] has sold, assigned, transferred, and conveyed . . . unto [the assignee], without recourse to the Assignor, all of [the assignor's] rights, title, and interest in (a) the Participation Agreement . . . and (b) [the assignor's] participation in a loan made by [the defendant] . . . [t]ogether with all of [the assignor's] rights and interest in the transaction described in Paragraphs (a) and (b) above . . . ." Id. at 150 n.2. The Court of Appeals found that the assignment "transferred all of [the assignor's] rights to [the assignee], tort as well as contract." Id. at 151. The Court of Appeals explained that the transfer of "rights and interest in the Participation Agreement" clearly included any claims grounded in contract, and went on to observe that "New York law does not require specific boilerplate language to accomplish the transfer of causes of action sounding

42

in tort." Id. The Court of Appeals continued: "[A]ny act or words are sufficient which show an intention of transferring the chose in action to the assignee . . . We conclude that language in the Assignment alone is sufficient to demonstrate [the assignor's] intent to transfer all of their [contract and tort] claims." Id. at 151-52 (internal citation and quotation marks omitted). The Court of Appeals considered the assignment unambiguous as to whether it included contract and tort claims, noting with respect to the tort claims that the use of the word "transaction" in the assignment demonstrated an intent to assign more than contract claims. Id. Banque Arabe thus reflects that the default rule in New York for broadly worded assignments that do not contain limiting language or purport to transfer only contract rights, is that such assignments include causes of action, although they may not refer to them explicitly.

Indeed in Banque Arabe, the Court of Appeals noted that the overall design of the transaction reinforced the conclusion that the assignment contemplated the assignment of all contract and tort claims. The Court of Appeals pointed out that the assignment was drafted in contemplation of the dissolution of the assignor, and "a party about to become defunct has little incentive to reserve transactional rights when transferring its interests . . . ." Id. at 153. So too here. All of the assets of Bishop & Co. were transferred to Pro Bono, LLC. It makes no

sense to conclude that the shell of Bishop & Co. retained any rights to sue.

The analysis in <u>Banque Arabe</u> applies directly to this case. The assignment in this case, like its counterpart in <u>Banque Arabe</u>, is phrased in broad terms without mentioning causes of action specifically, and does not restrict the transfer of rights to rights pursuant to a particular contract. (Pl.'s Ex. 24.) It is clear on the face of the assignment, as it was in <u>Banque Arabe</u>, that claims were included.

This conclusion derives further support from <u>Int'l Design Concepts, LLC v. Saks Inc.</u>, 486 F.Supp.2d 229 (S.D.N.Y. 2007). In <u>Int'l Design</u>, Judge Castel, applying New York law, held that a chain of assignments never explicitly mentioning the assignment of causes of action was nonetheless sufficient to assign tort claims. Judge Castel summarized the first assignment as transferring from AGI to HSBC "all assets of [AGI]." <u>Id.</u> at 237 (alteration in original). Judge Castel found this assignment "broad enough to encompass all causes of action owned by AGI." <u>Id.</u> The second assignment provided: "[HSBC] hereby sells, grants, assigns, transfers, conveys and sets over to [IDC] all of [HSBC's] right, title and interest in and to all of the Collateral conveyed by the May 18, 2004 peaceful possession letter." <u>Id.</u> Judge Castel held this assignment sufficient to transfer tort claims as well,

explaining that "[t]he words of both [assignments] are comprehensive and indicated that the parties intended that all assets be transferred." <u>Id.</u>  The same situation obtains in this case, in which it is unambiguous that Bishop & Co. and Pro Bono, LLC intended that all of Bishop & Co.'s assets be transferred. <u>See</u> Findings of Fact ¶¶ 74-75.  Thus, under New York State law, the language of the assignment from Bishop & Co. to Pro Bono, LLC was broad enough to encompass causes of action.

It should be noted that no party in this case has offered a conflict of laws analysis to determine which state law should apply to the construction of the assignment between Bishop & Co., a New York partnership, and Pro Bono, LLC, a Nevada Limited Liability Company.  The assignment itself does not contain a choice of law clause.  (<u>See</u> Pl.'s Ex. 24.)  No party has argued for the application of a law other than New York law to the issue of the scope of the assignment and the Court can accept that agreement to the application of New York law.[1]  <u>See, e.g.,</u> <u>Askir v. Brown & Root Services Corp.</u>, No. 95 Civ. 11008, 1997 WL 598587, at *4 n.2 (S.D.N.Y. 1997) (applying New York law in a diversity case brought in New York, where, as in this case, neither party had directly addressed the choice of law issue, one party had cited New York cases to support its argument, and

---

[1] In any event, the Court has not located any contrary Nevada law.

the other party had not disputed the applicability of New York law).

With respect to the third argument, the Congers have not revoked the plaintiff's standing to pursue this litigation. Indeed, the Congers initially encouraged and affirmed the litigation. Findings of Fact ¶¶ 88-90. Whether the Congers supported the litigation or not, they could not have stopped it by revoking the plaintiff's standing. "[U]nder Nevada's corporation laws, a corporation's board of directors has full control over the affairs of the corporation. The board's power to act on the corporation's behalf is governed by the directors' fiduciary relationship with the corporation and its shareholders, which imparts upon the directors duties of care and loyalty." Shoen v. Sac Holding Corp., 137 P.3d 1171, 1178 (Nev. 2006). The plaintiff is a Nevada corporation and thus the decision to prosecute the claims did not have to go through the Congers; rather, the decision was appropriately made by the directors. Once the plaintiff had possession of the claims, it was too late for the Congers to revoke standing. Because the plaintiff gained possession of the claims through the chain of assignments, rather than the renewed consent of the Congers, neither the Congers' belated alleged opposition to this litigation nor their revocation of the power of attorney from

one of the directors, Yanker, on November 10, 2005 affected the plaintiff's standing to prosecute the claims.

In fact, it should be noted that because Yanker and Fulrath, the directors of Pro Bono Investments, were also trustees of the Residual Holdings Trust, which is the beneficiary of any proceeds from this litigation, they may have been in breach of their fiduciary duty in their capacity as trustees of the Residual Holdings Trust had they not pursued this litigation.  It should also be noted that the fact that the proceeds from this litigation have been assigned to the Residual Holdings Trust does not affect the plaintiff's right to bring this litigation.  See <u>Achrem v. Expressway Plaza Ltd.</u> <u>Partnership</u>, 917 P.2d 447, 449 (Nev. 1996) ("[A] meaningful legal distinction exists between assigning the rights to a tort action and assigning the proceeds from such an action . . . When the <u>proceeds</u> of a settlement are assigned, the injured party retains control of their lawsuit and the assignee cannot pursue the action independently.") (emphasis in original).

3.    Plaintiff Pro Bono Investments, as the successor in interest to Bishop & Co., seeks recovery of the funds transferred from Bishop & Co. to the accounts of Mrs. Green and Mrs. Gerry, on the basis of unjust enrichment.  It is undisputed that New York State law governs this claim of unjust enrichment. "The elements for a claim of unjust enrichment under New York

law are: (1) that the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) the circumstances were such that equity and good conscience require the defendants to make restitution.  To prove unjust enrichment, the plaintiff must show that it conferred a benefit upon the defendants without adequate compensation." Pro Bono, 2005 WL 2429777, at *8 (S.D.N.Y. Sept. 30, 2005) (internal citation omitted). Unjust enrichment does not require the performance of any wrongful act by the enriched person, see Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999); Ptachewich v. Ptachewich, 465 N.Y.S.2d 277, 278-79 (App. Div. 1983), or even that the enriched party take an active role in obtaining the benefit, see Aetna Ca. & Sur. Co. v. LFO Constr. Corp., 615 N.Y.S.2d 389, 391 (App. Div. 1994).  Indeed, "[i]nnocent parties may frequently be unjustly enriched." Counihan, 194 F.3d at 361 (alteration in original).

    4.    Judith Green was unjustly enriched by the transfers of funds from Bishop & Co. during the years 1997 through 2001, in the total amount of $1,464,497.47, and her Estate is therefore liable to Pro Bono Investments for $1,464,497.47 plus prejudgment interest at the rate of 9% per annum in the amount of $1,098,204.75 through May 30, 2008, plus prejudgment interest thereafter to the date of judgment at a per

diem rate of $361.11 per day. (See Pl.'s Ex. 14; Tr. at 358-59.)

5.    Mrs. Gerry was unjustly enriched by the transfers of funds from Bishop & Co. during the years 1999 through 2001, in the total amount of $89,230, and she is liable to Pro Bono Investments for $89,230 plus prejudgment interest at the rate of 9% per annum in the amount of $64,058.37 through May 30, 2008, plus prejudgment interest thereafter to the date of judgment at a per diem rate of $22 per day. (See Pl.'s Ex. 14; Tr. at 358-59.)

6.    The unjust enrichment of Judith Green and Mrs. Gerry was at the expense of Pro Bono Investments as the assignee of the claims of Bishop & Co.

7.    Equity and good conscience require the executors of the estate of Mrs. Green and Mrs. Gerry to make restitution to Pro Bono Investments in the amounts transferred to them plus prejudgment interest at the rate of 9% per annum.  Neither Mrs. Green nor Mrs. Gerry had any right to the money that was transferred to their accounts from the accounts of Bishop & Co., which should have been invested solely for the benefit of the Congers.  Whatever the reason Mr. Bishop transferred the funds, neither Mrs. Green not Mrs. Gerry had any right to those funds and the funds should be returned to the successor of their rightful owners.  It is plain that Mrs. Green and Mrs. Gerry

were enriched and that they were enriched at the expense of Bishop & Co., the predecessor of the plaintiff Pro Bono Investments, Inc. They should return the funds.

8.    The defendants have asserted defenses of unclean hands and set off. However, these defenses fail because there is no evidence that Bishop & Co., the investment partnership for the Congers, had unclean hands or that any of the funds of Mrs. Green and Mrs. Gerry were ever invested in Bishop & Co.  Rather, it was Bishop & Co. that was a victim by having its funds diverted to Mrs. Green and Mrs. Gerry.

9.    The defendants have asserted a defense under N.Y. Gen. Oblig. Law § 15-108, which governs the effect of a release of, or a covenant not to sue, tortfeasors liable for the same injury.  The defendants argue that they should receive a credit for the settlement of the Gray Seifert action in an amount equal to the settlement amount or the equitable share of the damages that should be assessed to the Releasees.  This statute does not help the defendants, however, because the statute applies only to joint tortfeasors.  N.Y. Gen. Oblig. Law § 15-108.  Unjust enrichment is a quasi-contractual cause of action.  See, e.g., Gem Advisors, Inc. v. Invu, Inc., No. 01 Civ. 1340, 2002 WL 483118, at *6 (S.D.N.Y. Mar. 29, 2002) (collecting cases). Because unjust enrichment is not a tort action, § 15-108 does

not apply.  See <u>Bauman v. Garfinkle</u>, 652 N.Y.S.2d 32 (App. Div. 1997); <u>Boccia v. Murphy</u>, 770 N.Y.S.2d 592, 595 (Sup. Ct. 2003).

      10.    Pro Bono Investments also seeks to recover from Bishop as Managing Partner of Bishop & Co., based on claims of tortious conduct in effectuating loans to Mrs. Green and Mrs. Gerry, in failing to properly prepare the Promissory Note and consult an attorney in connection with the Note, in omitting the term and the amount of the Note, in failing to maintain books and records of Bishop & Co., in failing to have the Note properly executed, witnessed, and preserved, in failing to perfect the security interest, and for generally treating the Bishop & Co. assets as his own.  It is plain that these claims were released in the Settlement Agreement settling the Gray Seifert lawsuit.  The same actions that Bishop is charged with taking in this case were at the heart of some of the allegations in the Gray Seifert case.  (<u>See</u> Findings of Fact ¶¶ 94-95.) Bishop was a former officer of Gray Seifert at the time of the Release and was thereby included in the Release.  (<u>See</u> Findings of Fact ¶¶ 96-97.)  His actions were central to the allegations in the Gray Seifert complaint and indeed were allegedly taken, according to that complaint, as an owner and officer of Gray Seifert.  (<u>See</u> Findings of Fact ¶¶ 94-95.)  Moreover, Elliman specifically asked Bishop to obtain the Note that Pro Bono Investments claims was negligently obtained, prepared, and

maintained.  (Findings of Fact ¶ 51.)  Furthermore, the alleged

false representation to Mrs. Green about her assets in December,

1998, was made on Gray Seifert letterhead.  (Findings of Fact ¶

45.)

Finally, it would make no sense to interpret the Release as

excluding Bishop as a released party concerning the very same

transactions for which Pro Bono Investments sought to hold Gray

Seifert liable.  That would have left a gaping hole in the

protection Gray Seifert received in the Release because it would

have allowed Pro Bono Investments to pursue Bishop for the same

claims it asserted against Gray Seifert, and Bishop could then

have sought indemnification from Gray Seifert arguing that he

acted as its employee and agent.  Irrespective of whether such a

claim would have succeeded, it is unreasonable to expect that

Gray Seifert intended to obtain less than a complete release for

the very transactions for which it was paying the settlement

amount.

Thus the Release on its face covers Bishop.  The Release is

governed by New York law.  (Bishop Ex. 3 at ¶ 4.3.)  New York

courts have held that "[w]here the language of the release is

clear, effect must be given to the intent of the parties as

indicated by the language employed.  If [the releasing party]

wished to reserve any further claims . . . it should have added

words of reservation or, in the alternative, deleted the words

'in full satisfaction.'" <u>In re Schaefer</u>, 221 N.E.2d 538, 540 (N.Y. 1966) (internal citation omitted); <u>see also</u> <u>Allen v. The Katz Agency, Inc.</u>, 677 F.2d 193, 197 (2d Cir. 1982); <u>Lifeline for the Old in Jerusalem v. American Friends of Lifeline for the Old in Israel, Inc.</u>, 614 N.Y.S.2d 124, 124 (App. Div. 1994). In this case, the language of the Release is clear, there are no words of reservation, and the Release includes language equivalent to "in full satisfaction," namely, "In full settlement and compromise of any and all claims . . . ." (Bishop Ex. 3 at 1.1.)

The cases on which the plaintiff relies for the proposition that the Release should be interpreted to exclude Bishop's actions as a partner of Bishop & Co. do not support that proposition.

<u>In re Thomas McKinnon Securities</u>, 132 B.R. 9 (Bankr. S.D.N.Y. 1991), involved a defendant who borrowed money from the plaintiff, his employer at the time, for personal reasons and subsequently became an officer and director of a partnership affiliated with the plaintiff. With the debt still unpaid, the plaintiff, for unrelated business reasons, released all claims that it held against the partnership and all directors and officers of the partnership, among others. The plaintiff nevertheless sued the defendant in his individual capacity for repayment of the loan. <u>Id.</u> at 10. The defendant moved for

53

summary judgment, arguing that he was covered by the release.
The bankruptcy court refused to grant summary judgment,
explaining that "[the defendant] does not claim that his loan
obligation to [the plaintiff], which was incurred to purchase a
cooperative apartment in New York City when he was employed by
[the plaintiff], had any relationship to his subsequent capacity
as an employee and officer of the Partnership." Id. at 11. The
court further noted that because the case was at the summary
judgment stage, the release had to be read "in a light most
favorable to the plaintiff . . . ." Id. at 12. Moreover, the
court emphasized that the release had specifically named three
individuals whose individual liabilities the plaintiff
explicitly released. Id. at 11. The court reasoned that in
this context, it was at least ambiguous whether the release was
intended to cover the individual liability of the unnamed
plaintiff. Id. at 12. The Thomas McKinnon decision is thus
wholly inapposite to the Release at issue here. Unlike in
Thomas McKinnon, the claims the plaintiff wishes to pursue
against Bishop are directly intertwined with his actions as an
agent of Gray Seifert, for which he was released from liability.
(See Findings of Fact ¶¶ 94-95, 51, 45.) Unlike in Thomas
McKinnon, this action is not at the summary judgment stage, and
the release need not be read in the light most favorable to the
plaintiff; a trial has already occurred. And unlike in Thomas

McKinnon, the release in this case did not single out individuals whom it released from individual liability.  (See Bishop Ex. 3.)  Thus the release itself does not indicate, and provides no reason to believe, that Bishop would have been named individually if the intent of the parties was to release him from liability for the claims asserted by the plaintiff.

The plaintiff also cites Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F.Supp.2d 293 (S.D.N.Y. 2004).
Maddaloni involved the following release: "The parties hereby release all claims they might have against each other as of this date.  Notwithstanding the foregoing, this release does not apply to any claim by [the defendant] relating to merchandise purchased by [the plaintiff] for which [the plaintiff] has not yet paid."  Id. at 298.  The defendant attempted to use the release to preclude the plaintiff's claims relating to conduct occurring before the date of the release.  Id.  Judge Castel held that "the language and context of this release provision are so non-specific that I cannot, on a motion for summary judgment, conclude as a matter of law that the parties intended to release the defendants from liability for [the plaintiff's claims]."  Id. at 299.  The cursory release in Maddaloni is not

comparable to the detailed and clear Release in this case.
Maddaloni is therefore inapposite.[2]

Therefore the claims by Pro Bono Investments against Bishop
must be dismissed because they are barred by the Release and
Covenant Not to Sue in the Settlement Agreement.  (Bishop Ex.
3.)  It is thus unnecessary to reach the additional substantive
reasons that the claims lack merit, including the fact that they
are barred by the applicable statutes of limitations, having
first been asserted in October 2005.

11.   Pro Bono Investments also agreed in the
Settlement Agreement to indemnify Bishop for the costs of
defending claims, including attorneys' fees, such as those
brought against him in this case.  (Findings of Fact ¶ 97.)
Therefore Bishop is entitled to recover those fees.  While Pro
Bono Investments argues that Bishop did not assert such a claim
in this case, it is plainly asserted in the Joint Pretrial Order
and Pro Bono Investments agreed at trial to have the claim
decided even though it did not concede liability.  (Findings of
Fact ¶ 101.)  The amount of those fees can be established by the
submission of affidavits.

---

[2] The plaintiff also relies on two additional cases: Rottlund Homes of N.J.,
Inc. v. Saul, Ewing, Remick & Saul, LLP, 243 F.Supp.2d 145 (D. Del. 2003),
and Horizon Financial, F.A. v. Hansen, 791 F.Supp. 1561 (N.D. Ga. 1992).
Neither case is helpful to the plaintiff, however, because neither case was
decided under New York law and each case involved releases with language that
did not appear in the broad Release at issue in this case.

12.    Pro Bono Investments is entitled to renew its motion for sanctions against the defendants and their attorneys for the defendants' prosecution of unmeritorious federal securities claims in the amount of attorneys' fees spent defending against those claims, pursuant to the PSLRA, which entitlement and amount will be determined subsequent to the trial, upon the submission of additional briefs and sworn affidavits by counsel.  Bishop and the Congers have also moved for sanctions under the PSLRA and those motions can now be renewed based on the submission of briefs and affidavits detailing the costs and attorneys' fees.

CONCLUSION

For the reasons explained above, Pro Bono Investments is entitled to a judgment in its favor on its claim of unjust enrichment against the defendants.  Lawrence Bishop is entitled to a judgment dismissing the claim of Pro Bono Investments against him and to an award of indemnification for his costs and expenses.  Pro Bono Investments, Bishop, and the Congers can renew their motions for sanctions against the defendants under the PSLRA.  The parties should submit a proposed judgment by **November 3, 2008**.  The parties should also submit a proposed schedule for subsequent submissions with respect to sanctions

and all appropriate attorneys' fees and costs by **November 3,**
**2008**.

**SO ORDERED**

**Dated:    New York, New York**
**October 28, 2008**

John G. Koeltl
United States District Judge